IN THE MATTER OF JOHN J. CULLEN, AN ATTORNEY AT LAW.

Decided September 27, 1988.

ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that JOHN J. CULLEN of HACKENSACK, who was admitted to the Bar of this State in 1973, be suspended from the practice of law for a period of six months, and good cause appearing;

It is ORDERED that the report and recommendation of the Disciplinary Review Board is hereby adopted and JOHN J. CULLEN is suspended from the practice of law for a period of six months, effective October 11, 1988, and until the further order of this Court; and it is further

ORDERED that any application by respondent for restoration to the practice of law is to be accompanied by his submission of a psychiatric evaluation, at respondent's expense, by a psychiatrist to be appointed by the Board; and it is further

ORDERED that the restoration of respondent shall be conditioned on his practice of law under the supervision of proctor for a minimum of two years with the proctorship to be conducted in accordance with Administrative Guideline No. 23; and it is further

ORDERED that respondent be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys.

## APPENDIX

### *Report and Recommendation of the Disciplinary Review Board*

This matter is before the Board based upon a presentment filed by the District XI (Passaic County) Ethics Committee as well as the Board's determination to hold oral argument on a separate recommendation from said committee that respondent be privately reprimanded for his actions in an unrelated matter.

### THE JOHNSON MATTER

In March 1980 respondent was retained by Edward W. Johnson to handle a medical malpractice action. Mr. Johnson's wife, Aurelia, had been admitted to the hospital on August 10, 1979, with a confirmed diagnosis of Guillian–Barre Syndrome, a viral infection affecting the central nervous system. On November 17, 1979, the respirator supporting Mrs. Johnson malfunctioned, depriving her of oxygen for an undetermined amount of time and causing her to lapse into a coma. On May 7, 1980, Mrs. Johnson died without having regained consciousness.

On November 17, 1981, two years after the incident resulting in Mrs. Johnson's death, respondent filed a wrongful death action against the hospital, doctors and others entrusted with Mrs. Johnson's care, and the manufacturer of the respirator. The defendants filed their answers and served interrogatories upon respondent in December 1981 and January 1982. On February 11, 1982, the defendant manufacturer moved for and received an order compelling respondent to file more specific

pleadings identifying the model or serial number of the respirator alleged to have malfunctioned.

On April 14, 1982, when respondent's answers to interrogatories which were due on March 14, 1982, were not forthcoming, counsel for the defendant hospital filed a motion to compel answers to interrogatories and experts' reports. The court granted this motion and further directed that in the event respondent failed to answer interrogatories and supply experts' reports within 30 days, counsel could file an *ex parte* order for dismissal of the complaint. Nevertheless, no answers to interrogatories or experts' reports were submitted.

On June 4, 1982, an order dismissing the complaint against the manufacturer of the respirator for failure to supply more specific pleadings was filed. An order dismissing the complaint against the defendant hospital for failure to comply with demands for discovery was filed on July 6, 1982. Similar orders dismissing the complaints against the doctors were filed on January 7, 1983, and March 1, 1983.

On July 5, 1983, one year after the complaint against the defendant hospital was dismissed, respondent filed a motion to vacate the order of dismissal. The motion was granted and an order conditionally restoring the case to the calendar was filed on October 5, 1983. An amended order restoring the complaint against the hospital and dismissing the complaint with prejudice as to all other defendants was filed on October 31, 1983. No motion to reinstate the complaint against the other defendants was filed by respondent.

Mr. Johnson made numerous telephone calls to respondent over the course of three years requesting status reports. On those occasions when respondent returned the calls, he failed to advise his client of any difficulties or problems relating to the prosecution of the complaint. To the contrary, respondent repeatedly advised Mr. Johnson that everything was progressing in an orderly fashion.

Mr. Johnson's sole remaining cause of action against the hospital was set down for trial on January 23, 1984. On January 20, 1984, respondent contacted his client, advised him of the mandatory court appearance and requested a weekend meeting to discuss the matter.

On Saturday, January 21, 1984, respondent visited Mr. Johnson at his home. However, according to Mr. Johnson, he did not discuss their impending appearance in court.

Instead, he stood before me in my home and told me he had been totally negligent in handling my case. He stated he had missed certain crucial deadlines. As a result of his negligence, the doctors who he believed were primarily responsible for my wife's death had gotten away and were no longer defendants in the case. [1T22–11 to 18].[1]

Respondent also advised his client that he had had psychological problems for approximately one year and volunteered to supply him with a note from his doctor. He pleaded with Mr. Johnson not to file an ethics complaint. He did, however, invite Mr. Johnson to sue him personally for malpractice, adding that he did not have malpractice insurance.

On January 23, 1984, respondent failed to timely appear in court. Mr. Johnson, who did appear, personally requested an adjournment in order to obtain new counsel. The court denied his request and dismissed the complaint against the hospital. Therefore, as of January 23, 1984, Mr. Johnson's complaint had been dismissed with prejudice as to all defendants.

Mr. Johnson subsequently obtained new counsel who, on February 8, 1984, moved for a reconsideration of the prior orders dismissing the complaint. The trial court denied the motion. On appeal, the appellate division reversed the trial court's decision and remanded the matter, directing "that an appropriate hearing be conducted to determine the prejudice that each defendant may have sustained as a result of the passage of time occasioned by [respondent's] inattention, care-

---

[1] 1T denotes transcript of hearing before the District Ethics Committee December 13, 1984.

lessness and negligence and whether a sanction other than dismissal with prejudice would be reasonable and just with respect to each." *Johnson v. Mountainside Hosp., Resp. Disease Asso.,* 199 *N.J.Super.* 114, 121 (App.Div.1985). The matter was ultimately restored to the active trial calendar.

Based upon the foregoing, the committee found that respondent had violated *DR* 6–101(A)(1) and *DR* 6–101(A)(2) in that he had neglected the wrongful death action in such a manner that his conduct constituted both a pattern of negligence and gross negligence. The committee recommended that respondent receive a private reprimand with an admonition that he obtain psychotherapy and affiliate himself with a law firm in order to have his work supervised.

## THE KUPINSKI MATTER

In February 1980, respondent was retained by Mr. Stephen Kupinski to handle a negligence case involving an automobile accident that occurred on December 24, 1979. At the time of the accident, Mr. Kupinski was a passenger in an automobile owned and operated by Glen Martin. This automobile was struck in an intersection by a vehicle owned by Elena D. Ziefle and operated by Mark H. Smaling.

Upon initiating suit, respondent attempted to have defendants Ziefle and Smaling served with a summons and copy of the complaint. Service could not be effected as both defendants were in the military. Respondent neglected to have the matter placed on the military inactive list. Instead he simply held the matter in abeyance until their release from the military. They were ultimately served in March 1985 after Mr. Kupinski advised respondent that they had been discharged from the service. The defendants in turn entered appearances, filed answers and propounded interrogatories. As of July 26, 1985, the matter against Ziefle and Smaling remained active.

Defendant Martin was successfully served. After filing an answer, counsel requested a statement of damages, authorizations to obtain copies of Mr. Kupinski's medical records and

answers to interrogatories. Respondent failed to provide any of the requested discovery. Consequently, counsel for defendant moved and obtained a court order compelling respondent to provide all requested information. When the discovery was not forthcoming, counsel filed a motion to dismiss the complaint for failure to comply with the prior court order or, in the alternative, to compel answers to interrogatories. On March 2, 1983, the court dismissed the complaint against Martin.

On March 22, 1985, Mr. Kupinski sent respondent a letter demanding answers to a series of questions regarding his lawsuit. Respondent replied one week later on March 29, 1985. As to defendant Martin, respondent admitted that the complaint had in fact been dismissed for failure to answer interrogatories but that a motion for restoration would be filed. No such motion was filed. As to defendants Ziefel and Smaling, respondent stated that the matter had been delayed due to defendants' military status "and also delay on my part."

By letter dated May 3, 1985, Mr. Kupinski requested more specific information regarding the two law suits. A second request for such information was sent to respondent on July 8, 1985. In the interim, Mr. Kupinski filed grievances with the New York and New Jersey disciplinary authorities.

Mr. Kupinski made numerous inquiries regarding the status of his case during a five-year period of time commencing with his retention of respondent. Respondent always assured him that the matters were progressing satisfactorily. In reality, the complaint had never been served on defendants Ziefel and Smaling until March 1985 and the suit against defendant Martin had been dismissed two years previously.

Based upon the foregoing, the committee found that respondent had violated *DR* 6–101(A)(1) and *DR* 6–101(A)(2) in that he had handled the personal injury matter in such a manner that his conduct constituted both a pattern of negligence and gross negligence. The committee further found that respondent had failed to obtain psychotherapy and failed to arrange to practice

under the direct supervision of a New Jersey attorney in the year since the hearing on the Johnson matter which concluded on March 14, 1985. The committee recommended a public reprimand.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the committees in finding respondent guilty of unethical conduct are fully supported by clear and convincing evidence. Respondent's conduct in the two matters constituted gross negligence in each case in violation of *DR* 6-101(A)(1) and thus a pattern of negligence in both, in violation of *DR* 6-101(A)(2).

When respondent was retained by Johnson and Kupinski, he owed each of them a duty to pursue their respective interests diligently. *See In re Goldstaub*, 90 *N.J.* 1, 5 (1982); *Matter of Schwartz*, 99 *N.J.* 510, 518 (1985); *Matter of Smith*, 101 *N.J.* 568, 571 (1986). The record indicates that in each case, with the exception of some initial activity, respondent disregarded his obligation to his clients.

The record clearly indicates that once respondent drafted and filed complaints initiating suit in each matter, he lost interest in or track of his clients' cases. *In re Rigg*, 57 *N.J.* 288 (1970). He violated *DR* 1-102(A)(4) in failing to properly represent the status of their cases to his clients. *In re Goldstaub, supra,* 90 *N.J.* at 5 He also ignored many of his clients' requests for information and failed to advise them of pertinent developments as they occurred. "In some situations, silence can be no less a misrepresentation than words." *Crispin v. Volkswagenwerk, A.G.*, 96 *N.J.* 336, 347 (1984). An attorney's failure to communicate with his clients diminishes the confidence the public should have in members of the Bar. *Matter of Stein*, 97 *N.J.* 550, 563 (1984).

The Board finds by clear and convincing evidence that respondent consistently neglected matters that were entrusted to him for legal pursuit, failed to act promptly to keep his clients informed concerning the status of their cases, and refused to comply with or simply neglected reasonable requests for information or records. In fact, in preparing for his appearance before the Board, respondent discovered five additional cases that have suffered from substantially the same neglect as recounted hereinabove. Such transgressions reflect on the competency and integrity of the entire Bar and cannot be condoned. *In re Barry*, 90 *N.J.* 286, 291 (1982); *In re Palmieri*, 75 *N.J.* 488, 489 (1978).

The purpose of discipline is not the punishment of the offender, but "protection of the public against the attorney who cannot or will not measure up to the high standards of responsibility required of every member of the profession." *In re Getchius*, 88 *N.J.* 269, 276 (1982), citing *In re Stout*, 75 *N.J.* 321, 325 (1978). "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian*, 88 *N.J.* 308, 315 (1982). Therefore, mitigating factors are relevant and may be considered. *In re Hughes*, 90 *N.J.* 32, 36 (1982).

In mitigation, respondent's counsel advised the Board at the hearing before it that the Kupinski matter had been taken over by new counsel, the complaint against Martin reinstated, and the matter settled in May 1987. [3T 13–17 to 14–3].[2] Further, the additional cases of neglect which respondent voluntarily disclosed (and which have not resulted in ethics changes) are now being addressed by respondent's supervisory partner or other counsel of the client's choice [3T 23–2 to 27–17].

During the March 14, 1985 hearing before the committee on the Johnson matter, respondent's therapist testified that for

---

2 3T denotes transcript of Board hearing on September 16, 1987.

much of the period of time in question, respondent had a problem with procrastination. More specifically, respondent suffered from a preconscious conflict between the perfectionistic expectations of himself and pathological avoidance of financial success and feelings of pride. On the one hand, he felt driven to perform his work beyond normal expectations and requirements of excellence. He expected to do exhaustive research on each case, and to have inevitable victory in court. The slightest doubt about how his case preparation was proceeding, the slightest error or doubt about winning could paralyze him into inactivity and delay the case indefinitely. [2T12-18 to 13-6].[3]

The Board is concerned, however, that although respondent had, at the conclusion of the hearing on the Johnson matter, requested an opportunity to continue in psychotherapy and to work under the supervision of another attorney, he did not promptly do so. His reentry into psychotherapy did not commence until one year later, about the time of the hearing on the Kupinski matter.

Although the Johnson and Kupinski matters were taken over by new counsel and ultimately brought to apparently successful conclusions with minimal or no damage to the clients, the need for public discipline is clear. Accordingly, the Board unanimously recommends that respondent be suspended from the practice of law for a period of six months. Additionally, the Board further recommends that respondent continue with psychological treatment until discharged. Further his restoration to practice should be conditioned upon an independent psychiatric examination, at his own expense, by a Board-appointed psychiatrist. Finally, in the event respondent is restored to practice, the Board recommends he be required to practice under a proctor for a minimum of two years. One member did not participate.

The Board further recommends respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.

---

[3]2T denotes transcript of hearing before the District Ethics Committee March 14, 1985.