571 A.2d 288

IN THE MATTER OF ARTHUR N. MARTIN, JR., AN
ATTORNEY AT LAW.

Argued November 28, 1989—Decided March 23, 1990.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Theodore V. Wells, Jr.,* argued the cause for respondent (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys).

PER CURIAM.

This disciplinary action is based on eight client complaints charging respondent with gross negligence, neglect, and other unethical conduct. Those complaints resulted in four separate recommendations by the District V–A Ethics Committee. The

Disciplinary Review Board (DRB or Board) consolidated those matters for oral argument and determined that respondent was grossly negligent in the representation of his client in seven of the eight cases reviewed, and that respondent engaged in a pattern of neglect. Moreover, the DRB found that respondent engaged in other unethical conduct, including negotiating settlements without the authorization of clients, advancing sums of money to clients for personal expenses, and violating *DR* 1–102(A)(6) ("other conduct that adversely reflects on his fitness to practice law").

Although the DRB unanimously found that the ethical infractions warranted public discipline, it was divided on the appropriate penalty: the five-member majority concluded that a six-month suspension was proper, while one dissenting member recommended a three-month suspension. Our independent review of the record leads us to conclude that a six-month suspension is the appropriate discipline.

I.

Respondent was admitted to practice law in this state in 1973. Following a judicial clerkship, respondent became a Deputy Attorney General in the Civil Rights Division. Thereafter, he entered private practice, focusing on employment discrimination and related matters.

The DRB reviewed the findings of the ethics committee, which were summarized as follows:

### *Woodham Complaint*

Following the October 4, 1978 death of Sidney Blue, the respondent agreed to handle the administration of the estate. In June of 1980, respondent was advised by the surrogate that a problem existed with decedent's will, since a specific bequest had been lined out. Within the next three months, respondent obtained the affidavits of witnesses confirming that this interlineation preceded the signing of the will. In order to proceed with probate, respondent twice wrote to the grievant in an attempt to obtain her signature on a complaint and her accompanying affidavit. However, following his second communication on September 4, 1981, he took no action on the estate for three years. During this

time, he moved his office twice. Finally, in July of 1984, the grievant contacted the District V Ethics Committee. Subsequently, in November of 1984, the respondent filed the appropriate papers to probate the will of Sidney Blue. One month later, he returned an insurance draft to the insurer to be reissued. The draft had been in his possession, undeposited and not earning interest, since December of 1979.

Respondent admitted that he failed to move expeditiously in this case. He stated that during the years in question, he had problems in reaching the grievant and personal problems, including the dissolution of a law partnership.

The Committee found that respondent was grossly negligent, in violation of *DR* 6-101, and failed to act with reasonable diligence as required by *DR* 7-101. Although the committee recommended a private reprimand, the Board determined to hear this case with the additional matters filed against the respondent.

## Braxton Matter

Respondent represented Vivian Braxton in an action filed against the City of Orange Housing Authority. In May of 1980, Mrs. Braxton was a commissioner of that housing authority, and contended, among other things, that she was harrassed by her fellow commissioners. Suit was filed on her behalf. Respondent's subsequent failure to answer interrogatories resulted in a motion from his adversary to dismiss the case or compel answers. This motion was adjourned based on respondent's representation that the matter could be settled by a conference between the parties. Discussions between respondent and his adversary occurred during September 1980 and the case was settled on or about October 1. A stipulation of dismissal with prejudice signed by respondent was forwarded to his adversary on October 22, 1980.

Thereafter, a meeting was held between respondent, his client, another commissioner of the housing authority, and the counsel to the housing authority. At the conclusion of that meeting, it was agreed that respondent's client would submit documentation of her grievances to the housing authority's attorney, and he, in turn, would attempt to address the problems. No such documentation was ever submitted. Respondent claimed that his client never provided the documents to him.

Although the grievant was aware from respondent that her case would eventually be settled, she did not learn of the actual settlement until late 1980 when she asked respondent about a trial date. Since the "harassment" she previously complained of was continuing, she told respondent to reopen the matter. Respondent thereafter filed a motion to reopen dated November 24, 1980 and returnable December 22, 1980, followed by a second motion returnable of [sic] May 11, 1981. Both were unsuccessful.

While respondent may have discussed the likelihood of settlement of this matter with his client, the ethics committee concluded that he did not have the client's informed consent to dismissal of her suit with prejudice at the time the stipulation was signed. Nor did he have informed consent when he forwarded the stipulation to the court on October 29, 1980. The committee considered that no writing existed documenting the terms of settlement, and that no discovery

had been undertaken by respondent when the settlement was reached, although a pre-trial conference was imminent.

During the pendency of the litigation, respondent visited the grievant at her home. Ms. Braxton discussed her dissatisfaction with respondent's handling of the case at that time. During that meeting, she noticed that respondent was carrying a gun. She was frightened although she stated later that she did not believe respondent was trying to frighten her. Respondent admitted to carrying the unloaded weapon, but contended that he had the gun on his person because he was either on his way to or returning from the firing range.

The committee concluded that respondent violated DR 7-101 and DR 1-102 in his handling of the Braxton litigation. Further, carrying a pistol during a meeting at a client's home was contrary to DR 1-102, and was both improper and ill-advised, the committee decided.

## Gambrell Complaint

Respondent was retained to represent Doris Gambrell in an action against Amerada Hess Company which charged racial discrimination. Suit was filed on March 17, 1980, and interrogatories were served on respondent in May of that year. Although the interrogatories were answered, respondent's adversary thereafter obtained court orders on several occasions which directed more specific answers. While certain documentation was filed by respondent and/or his client, it did not fully comply with these orders. Respondent advised the court in a letter dated February 17, 1981, that he intended to make a motion to the court to be released as counsel. He further advised that he had no control over his clients and believed that new counsel might be able to insure compliance with the court's order.

Supposedly tied to the issue of proper responses to the interrogatories was a failure of respondent to request a jury trial in the Gambrell complaint. Respondent was well aware that these clients wanted a jury trial. He knew at least as of December 17, 1980, of his dereliction in that regard, and he so advised his clients. Nonetheless, he failed to take any action to remedy the situation until an April 6, 1981 motion for leave to amend the complaint. During the hearing on that motion, he implied to the court that his clients' lack of cooperation in furnishing responsive answers was a primary result of his failure to make a timely demand for a jury trial.

Ultimately, on May 21, 1981, the Gambrells' complaint was dismissed with prejudice because more responsive answers to the interrogatories had not been submitted. The Gambrells were not aware of the dismissal until July 10, 1981.

At some point after he advised his clients of his failure to demand a jury trial, respondent began to advance substantial sums of money to the Gambrells for car and motel rental and miscellaneous expenses. These payments continued until approximately July 9, 1981, and totalled at least $8,000. While Mrs. Gambrell stated that respondent advanced the money because he expected to be retained to manage the millions of dollars she anticipated receiving from Amerada Hess, respondent explained his actions by stating that he felt sorry for the Gambrells, who were both unemployed and in dire straits.

In June 1981, the respondent met with the Gambrells at his office. There was no indication that the meeting was hostile. At the conclusion of the meeting, respondent took a gun and a box of bullets from his desk, and put them on top of the desk. Mr. Gambrell said to his wife, "Lets (sic) go." They then followed respondent, who had the gun in his hand, down a hallway. Mrs. Gambrell said "Mr. Martin, excuse me, you don't need that for us." Respondent replied "No, this is not for you. I am merely going to target practice."

The committee concluded that respondent's failure to request a jury trial and his failure to file responsive interrogatories constituted elements of negligent conduct and were part of a pattern of neglect found in this and other matters before the committee. A violation of *DR* 6–101 was therefore found. Moreover, the committee found that his report to his clients concerning the significance of the failure to request a jury trial was materially misleading. The committee determined that, even assuming a lack of cooperation by the Gambrells, the vague and even incomprehensible documents filed by respondent in reply to orders for more responsive interrogatories demonstrated a lack of due diligence on respondent's part.

The committee further concluded that respondent did nothing to modify his clients' "legal fantasies" concerning the outcome of their case. In advancing significant sums to the Gambrells, he encouraged their unrealistic expectations and violated *DR* 5–103(B). Additionally, his retainer agreement with the Gambrells violated *R.* 1:21–7.

The committee found no justifiable reason for displaying a pistol and bullets during the client interview, and found respondent's action to be indefensible.

## Bradley Complaint

Vernell Bradley retained respondent on February 1, 1980, to represent her in an employment discrimination matter. She paid respondent a total of $1,000 of an agreed upon retainer of $1,500. Respondent filed suit. During a pre-trial conference on May 17, 1982, an offer of settlement for $1,000 was made, and the case was marked as settled, pending approval by Mrs. Bradley.

Mrs. Bradley had not authorized respondent to accept a $1,000 offer. Despite respondent's recommendation that the settlement be accepted, Mrs. Bradley rejected the proposal. Although, pursuant to the court's statement, respondent could have reopened the matter within sixty days, he failed to make a timely application. His motion to reopen filed on July 19 was therefore denied.

Thereafter, respondent failed to keep his client advised as to the status of the case. Once it became clear that the matter would not be reopened, he failed to advise his client fully, and failed to obtain the $1,000 settlement amount.

The District VA Ethics Committee concluded that respondent's conduct was grossly negligent and violated *DR* 6–101(A)(1). Additionally, respondent's actions prejudiced and damaged his client during the course of the professional relationship, contrary to *DR* 7–101(A)(3).

## Watkins Matters

Respondent represented Murrell Watkins in two separate matters. In both matters, respondent acted in an unethical fashion. In the first matter, respondent accepted a $500 retainer from Watkins on October 19, 1984, to represent him in pending litigation. Watkins sought the recovery of funds held in escrow at an earlier sale of property. Respondent took no action relative to this litigation. On January 23, 1985, two days prior to the scheduled trial date, respondent advised his client that because of an alleged conflict of interest, he could not appear at trial. He referred the matter to an associate.

The District VA Ethics Committee determined that the purported conflict was an inconsequential issue raised late in the case by respondent. That Committee further found that respondent carried out no discovery in the case and refused to appear for his client in court. His conduct was therefore part of the pattern of neglect found by the committee.

In the second Watkins matter, respondent was retained in June 1984 to pursue a claim of racial discrimination by several Atlantic City casinos against Watkins' bus company and another bus company. Respondent accepted a $3,000 retainer: $1,500 from grievant and $1,500 from the owner of the second bus company. The matter was thereafter dismissed on November 27, 1985, when defendant's motion for summary judgment was granted. The court reasoned that the plaintiffs no longer owned the bus companies involved and therefore lacked standing to sue.

Although suit was filed in the case, respondent failed to take depositions or interview witnesses whose names were provided by the grievant.

The committee determined that respondent did "practically nothing" to justify the $3,000 fee. His conduct was found to be grossly negligent and constituted a part of the pattern of neglect found by the Committee. DR 6–101; RPC 1.1(a) and (b).

## Bristol Matter

Kenneth Bristol sought respondent's representation in a suit against his employer, Conrail, for discriminating against him on the basis of race. Bristol was fired by Conrail in August 1980 for insubordination. Although he was subsequently reinstated, he sought back pay for time lost from work. Respondent filed suit on behalf of Bristol in January 1985. In his answers, respondent admits that discovery was ordered to be completed by August 1, 1985. However, he failed to take any action to develop the facts to support his client's claim. He did not propound interrogatories, interview co-workers or supervisors, review employment records, or conduct any depositions. As a result, the court granted summary judgment in defendant's favor on September 24, 1985, because a prima facie showing of disparate treatment on the basis of race had not been made.

The District VA Ethics Committee determined that respondent neglected this matter and took virtually no action after Bristol paid him an $800 retainer. The hearing panel concluded that respondent failed to carry out a contract of

employment, and demonstrated a lack of due diligence, all in violation of *RPC* 1.1(a), *RPC* 1.1(b) and *RPC* 1.3.

## *Ferreira Matter*

Respondent was retained on October 30, 1983, to represent Judite Ferreira and her husband in a personal injury action resulting from an automobile accident. In early 1985, prior to the filing of any civil complaint, respondent learned from his associate that the defendant driver had only $15,000 in insurance coverage, and did not own a home. While respondent's associate testified that she gleaned the policy information from the insurance company's claim representative, that representative testified that he did not recall such a conversation. His notes showed that in [sic] May 15, 1985, in response to an inquiry from respondent, he advised that the policy limits exceeded $15,000.

The Ferreiras investigated and determined that the driver owned a home and had a policy limit of $100,000, rather than the $15,000 stated by respondent. They obtained another attorney and settled the case for $75,000.

The Committee concluded respondent failed to prove vigorous representation and did not properly investigate the case. The panel found that he neglected the matter and thereby violated *RPC* 1.1(a), *RPC* 1.1(b) and *RPC* 1.3.

## *Henriquez Complaint*

In August 1983, David Henriquez paid respondent a total of $750 to represent him in civil rights litigation then pending against Conrail. Although $250 of the amount paid to respondent was for depositions, respondent did not depose anyone. In fact, respondent failed to take any appropriate action to investigate his client's case. Ultimately, respondent advised Henriquez to drop the suit for lack of evidence.

The hearing panel found this matter to be a flagrant case of neglect by respondent. The Committee concluded that respondent violated *RPC* 1.1(a), *RPC* 1.1(b) and *RPC* 1.3.

The DRB did not find clear and convincing evidence of unethical conduct in the *Ferreira* matter. The Board concluded, however, that respondent's representation of the remaining seven grievants was "fraught with unethical conduct." The Board found by clear and convincing evidence that respondent consistently neglected matters that were entrusted to him and that the neglect followed certain patterns:

For example, in *Bristol, Henriquez,* and the two *Watkins* matters, respondent accepted fees and thereafter failed to take action on his clients' behalf. Again in the *Watkins* and *Bristol* matters, and additionally in *Braxton* and *Gambrell,* respondent conducted virtually no discovery or investigation on the client's behalf. Similarly, in the *Woodham* estate matter, respondent simply failed to

take any action for a three-year period. In *Bradley,* respondent failed to move to reopen his client's action promptly, and, when reopening was denied, he failed to obtain the settlement amount for his client.

The Board also found by clear and convincing evidence that respondent had engaged in other unethical conduct:

Specifically, in both *Bradley* and *Braxton* respondent negotiated settlements without the authorization of his clients. He thereby prejudiced the rights of these clients in violation of *DR* 7–101(A) and *DR* 1–102(A)(6). Also, in *Gambrell,* he advanced significant sums of money to the clients for personal expenses contrary to *DR* 5–103(B).

Furthermore, the respondent's actions in displaying his pistol to the Gambrells during the course of a somewhat heated discussion, and to Mrs. Braxton during a meeting where her dissatisfaction with her case was at issue, are absolutely indefensible. Both clients were frightened by the presence of these weapons. Respondent contends that he was simply on his way to firing practice. However, in neither case did respondent initiate any explanation for the presence of the gun. Rather, once the client expressed concern, respondent reassured them that the weapon was not intended for them but for target practice. While respondent may not have threatened his clients directly, it had to be obvious, even to respondent, that the presence of a gun at a business meeting would intimidate any client. His conduct therefore violated *DR* 1–102(A)(6).

Our independent review of the record leads us to conclude that the factual findings of the DRB are correct, and we adopt them.

## II.

Respondent owed his clients a duty to pursue their matters with diligence. *In re Smith,* 101 *N.J.* 568, 571, 503 *A.*2d 846 (1986); *In re Schwartz,* 99 *N.J.* 510, 518, 493 *A.*2d 1248 (1985); *see In re Cullen,* 112 *N.J.* 13, 19–20, 547 *A.*2d 697 (1988). The record indicates that once respondent had accepted a retainer and drafted a complaint, he neglected his clients. *Cullen, supra,* 112 *N.J.* at 19, 547 *A.*2d 697; *In re Templin,* 101 *N.J.* 337, 341, 502 *A.*2d 1 (1985). He routinely failed to take discovery or to answer interrogatories. Disregard of his obligations prejudiced his clients' interests. Moreover, respondent neglected his duty to communicate with his clients, *In re Goldstaub,* 90 *N.J.* 1, 5, 446 *A.*2d 1192 (1982), failed to keep them informed of the status of their cases, *In re Stein,* 97 *N.J.*

550, 563, 483 *A.*2d 109 (1984), and in two matters entered settlement agreements without obtaining authorization from his clients. "The picture presented is not that of an isolated instance of aberrant behavior unlikely to be repeated. Respondent's conduct over a period of years has exhibited a 'pattern of negligence or neglect in his handling of matters.' " *In re Fusciello,* 81 *N.J.* 307, 310, 406 *A.*2d 1316 (1979) (citation omitted); *see In re Getchius,* 88 *N.J.* 269, 276, 440 *A.*2d 1341 (1982); *In re Conti,* 75 *N.J.* 114, 117, 380 *A.*2d 691 (1977). Such serious dereliction cannot but undermine the public's confidence in our profession. *Cullen, supra,* 112 *N.J.* at 20, 547 *A.*2d 697; *In re Barry,* 90 *N.J.* 286, 291, 447 *A.*2d 923 (1982); *In re Palmieri,* 75 *N.J.* 488, 489, 383 *A.*2d 1142 (1978).

We have often noted that "[t]he severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982). For that reason, we consider factors in mitigation of the seriousness of the offense. *In re Hughes,* 90 *N.J.* 32, 36, 446 *A.*2d 1208 (1982).

Respondent has taken steps to ensure that these infractions do not recur. Respondent advised the DRB that he has revised his procedures in accepting clients. He has hired a former employee of the Equal Employment Opportunity Commission, who will assist him in evaluating new cases. Although previously he accepted cases involving employment discrimination based solely on the client's claim, he no longer accepts new matters until he has verified that there are valid grounds for suit. Moreover, respondent stated that he now tries to dispel any client's unrealistic expectations about the potential recovery in employment-discrimination litigation.

We note as well that respondent's misconduct was not "undertaken in any selfish effort looking to personal aggrandizement." *Conti, supra,* 75 *N.J.* at 117, 380 *A.*2d 691. His practice serves a segment of the community that has experienced employment discrimination and needs legal services, yet

may have difficulty finding legal counsel. His clients often cannot afford to pay for expenses, and his compensation is usually dependent on the outcome of litigation. Nevertheless, the clients served by respondent deserve representation by an attorney who upholds all of the standards of our profession. Those mitigating circumstances in no way excuse respondent's ethical infractions.

The question of discipline is a difficult one. The DRB noted similarities between this case and *Cullen, supra,* 112 *N.J.* 13, 547 *A.*2d 697, in which the attorney was found to have neglected two matters and admitted to similar conduct in an additional five matters. The attorney was suspended from the practice of law for six months. By a five-to-one vote, the DRB recommends the same discipline here, with one member voting for a three-month suspension. In our view, the events and circumstances of respondent's multiple violations fully warrant imposition of the discipline recommended by the DRB. Based on our independent review of the record, we impose a six-month suspension on respondent.

Respondent shall reimburse the Ethics Financial Committee for any administrative costs.

So ordered.

*For Suspension*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

## ORDER

It is ORDERED that ARTHUR N. MARTIN, JR., of NEWARK who was admitted to the bar of this State in 1973, be suspended from the practice of law for a period of six months, effective April 9, 1990, and until the further Order of this Court; and it is further

ORDERED that ARTHUR N. MARTIN, JR., reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that ARTHUR N. MARTIN, JR., be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that ARTHUR N. MARTIN, JR., comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.