IN THE MATTER OF JOSEPH P. GRABLER, AN
ATTORNEY AT LAW.

January 11, 1989.

## CORRECTED ORDER

The Disciplinary Review Board having filed a report recommending that JOSEPH P. GRABLER of MIDDLETOWN, who was admitted to the Bar in this State in 1964, be suspended from the practice of law for one year for conduct in violation of *DR* 1–102(A)(1), (3), (4), and (6); *DR* 6–101(A)(1); *DR* 7–101(A)(1), (2) and (3); *DR* 7–102(A)(3), (5), and (8), and *DR* 9–102, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and JOSEPH P. GRABLER is suspended from the practice of law for one year and until further order of this Court, effective February 1, 1989; and it is further

ORDERED that JOSEPH P. GRABLER reimburse the Ethics Financial Committee for appropriate administrative costs, including the production of transcripts; and it is further

ORDERED that JOSEPH P. GRABLER be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that JOSEPH P. GRABLER comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

### *Decision and Recommendation of the Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based upon two presentments filed by the District VIII (Middlesex County) Ethics Committee.

### THE SEAMAN MATTER

On or about October 1, 1981, respondent was retained by Carole and Walter Seaman to represent them in a real estate matter. In October 1980, the Seamans had entered into an agreement to purchase a house owned by Mr. Seaman's parents. Upon reaching an agreement, the parties retained one

attorney to represent both sides in the transaction. However, after the initial closing date had to be delayed due to the illness of one of the parties, the attorney determined he could not represent both sellers and buyers. He, therefore, contacted respondent and asked him to represent the Seamans.

Upon meeting the Seamans, respondent indicated that his fee would be $300.00. He also indicated they would be responsible for a $30.00 fee for recording the mortgage and deed and a $202.00 fee for title insurance. The Seamans immediately gave respondent a check in the amount of $532.00.

A review of the closing documents disclosed a discrepancy in the metes and bounds description. It was therefore decided the documents would be redrafted and an instrument executed with the lot and block number only. There was initially some confusion over which attorney was to prepare the new documents. However, approximately one month after the closing, respondent assumed full responsibility for completion of the matter.

Mr. and Mrs. Seaman thereafter called respondent on several occasions inquiring about the status of the matter. On one such occasion, Mr. Seaman urged respondent to complete the paperwork quickly, as he was concerned he would not qualify for a homestead rebate. Respondent assured him the mortgage and deed would be recorded without delay.

When it became apparent respondent had not filed or recorded the deed and mortgage, the Seamans retained a New York attorney to complete the unfinished aspects of the transaction. On November 15, 1982, the new attorney sent respondent a letter offering him an opportunity to complete all unfinished paperwork. Respondent was also advised that failure to do so would result in a complaint being filed with the Bar Association. Respondent failed to take any action or otherwise reply to the attorney's letter. Consequently, on November 23, 1982, the attorney sent respondent a final letter advising him that a

complaint was being filed with the Bar Association. Respondent did not reply.

A formal complaint was filed against respondent on September 12, 1984. The hearing was scheduled for and held on February 14, 1985. The mortgage and deed were finally recorded in the County Clerk's office on that date.

THE LEIGHTON MATTER

On July 11, 1977, respondent was retained by Harry Leighton, principal owner of a real estate brokerage firm known as the Academy Agency, to clear title to a piece of property the agency desired to sell. On that date, Mr. Leighton sent respondent a $500.00 retainer and asked him to "resolve this situation as quickly as possible." No written fee agreement was executed.

Over the next four years, Mr. Leighton made numerous telephone calls to respondent about the status of the matter. He also sent respondent nine separate letters, the majority of which demanded status reports and copies of all documents or letters pertaining to the matter. Respondent rarely returned the telephone calls and sent but three reply letters. Respondent testified that "there were telephone conversations in between, and after a while I didn't read his letters, they were just a nuisance." [1T97–17 to 20].[1]

For four years respondent led Mr. Leighton to believe a bill to quiet title had been filed and was progressing satisfactorily. On at least two occasions, he provided Mr. Leighton with anticipated dates of resolution, only to have these dates pass without any further communication. In fact, no bill to quiet title had been or was ever filed.

Moreover, respondent assured Mr. Leighton that Academy Agency was the sole owner of the property in question when, in fact, there was at least one other party with a legal claim to the

---

[1] 1T denotes the transcript of the hearing before the district ethics committee on May 3, 1984.

property. Mr. Leighton was ultimately constrained to enter into a settlement agreement conceding a majority interest in the parcel to that individual.

On May 8, 1981, Mr. Leighton sent respondent a final letter demanding a refund of the $500.00 retainer and a complete copy of the file respondent had opened. Mr. Leighton also advised respondent that he intended to file an ethics complaint and civil suit against him. Mr. Leighton never received a reply or refund of the retainer.

THE SCOTT MATTER

On September 13, 1978, respondent was retained by Joseph D. Scott of Joseph D. Scott Associates, a developer of residential real estate, for the purpose of instituting suit against the Old Bridge Sewer Authority. On that date, Mr. Scott sent respondent a letter setting forth the pertinent facts and confirming that the action was to be initiated "as promptly as possible." Mr. Scott also enclosed a check in the amount of $1,000.00 as a formal retainer. No written fee agreement was executed.

On January 29, 1979, after not having heard from respondent for over four months, Mr. Scott sent respondent a letter requesting information about the status of the matter. Respondent did not reply. Over the next six months, Mr. Scott placed numerous telephone calls to respondent's office seeking information about his case. During several conversations, respondent advised that a complaint had been filed and that he was waiting for the Sewer Authority's answer before proceeding any further. Finding it inconceivable that an answer had not been filed in six months, on June 25, 1979, Mr. Scott sent respondent another letter formally requesting a status report. Respondent again failed to reply.

On October 27, 1980, Mr. Scott sent respondent yet another letter. Again, respondent failed to reply. Repeated telephone calls invariably elicited the same response, that a complaint had

been filed and respondent was still waiting for the Sewer Authority's answer. In fact, respondent had not filed suit.

In or about early 1981, upon learning that respondent had not filed suit, Mr. Scott contacted the Monmouth County Bar Association to file an ethics complaint. At that time, he was referred to another attorney. Respondent ultimately refunded the original $1,000.00 to Mr. Scott's new attorney. However, Mr. Scott would not accept the money.

THE HUFF MATTER

In or about early 1980, respondent was retained by Calvin and Ida Huff for the purpose of assisting them in the refinancing of their home. The Huffs had applied for a mortgage to pay off two private mortgages held by an I.M. DeBella. Respondent was to handle the closing and follow the matter through to completion.

On May 15, 1980, Ocean Federal Savings and Loan Association ("Ocean Federal") issued a mortgage commitment to the Huffs. A copy of the commitment and a list of attorney's instructions were contemporaneously sent to respondent. The list of instructions indicated respondent was to obtain a title insurance policy listing Ocean Federal as first or primary mortgagee.

The closing was held on June 19, 1980. Respondent paid off the two private mortgages on June 26, 1980, but failed to ensure that both private mortgages be satisfied and discharged of record. Therefore, he was unable to obtain or provide Ocean Federal with the necessary title insurance policy.

Ocean Federal repeatedly called respondent requesting a copy of the new mortgage and title insurance policy listing it as first mortgagee. It also sent respondent letters on January 16, 1981 and June 16, 1981 requesting these documents. Although respondent forwarded the original recorded mortgage on April 10, 1981, none of the requests for the title insurance policy was honored.

On August 7, 1981, after previous attempts by its attorney to obtain the title insurance policy had proved futile, Ocean Federal sent respondent one final letter. The letter advised respondent that a complaint would be filed with the district ethics committee if the policy was not received within ten (10) days. Respondent did not reply. A complaint was filed on August 26, 1981. The outstanding private mortgage was not cancelled of record until February 22, 1982. Respondent then obtained the title insurance policy and forwarded same to Ocean Federal.

TRUST ACCOUNT IRREGULARITIES

On September 16, 1981, after receiving a copy of the complaint filed with the committee by Ocean Federal, the Office of Attorney Ethics commenced a demand audit of respondent's trust account. Follow-up audits were conducted on November 4, 1981 and December 29, 1981. The audit initially revealed that, with the exception of $48.00 remaining in the account at the conclusion of the transaction, all of the funds in the Huff real estate matter had been properly disbursed and accounted for. Respondent later explained that the outstanding $48.00 had been paid out of an account he maintained with the Monmouth County Clerk's Office.

Examination of respondent's trust account records disclosed that there were sixty-six ledger sheets with open credit balances totaling $16,054.96. There were also thirteen ledger sheets with open debit balances amounting to $2,600.16. The net balance was $13,454.80. However, the balance in respondent's trust account on the date of the audit was only $13,007.44. Consequently, respondent was $447.36 out of trust.

Further examination disclosed that many of the trust account ledger sheets reflected old outstanding balances. More specifically, eleven of the thirteen ledger sheets showing debit balances dated back prior to 1981. Of these, there was one account whose last transaction occurred in 1974. Four accounts dated back to 1976, one to 1977, two to 1978 and three to 1979.

The individual clients' trust ledger accounts similarly showed credit balances that had been open for a considerable period of time. In fact, fifty-three of the sixty-six ledger sheets showing credit balances dating back prior to 1981. Of these, thirteen dated back to 1975 and before, three to 1976, three to 1977, seven to 1978, eight to 1979 and nineteen to 1980.

Respondent indicated that the credit balances were primarily fees he had earned but not removed from the account. He could not, however, explain the existence or age of the debit balances. He stated it had been his impression that his accountant had been maintaining his trust account in an appropriate manner. He had not been made aware of any problems that may have existed. When the auditor advised him of the problems he had found, respondent requested and was given an opportunity to correct them.

In an attempt to reconcile his records, respondent instructed his secretary to carry out sixty-five separate banking transactions. On November 2 and 3, 1981, respondent drew fifty-three checks totalling $7,557.54 from his trust account for deposit to his business account. In so doing, respondent attempted to cancel out those credit balances which ostensibly represented fees and reimbursements due him. Respondent contemporaneously drew twelve checks totalling $2,265.27 from his business account for deposit to his trust account. These transactions represented an attempt to eliminate the debit balances reflected in the trust ledger sheets.

However, even after the sixty-five transactions had been completed, there was still a shortage in the trust account of $394.30. In fact, the auditor noticed that a new account with a debit balance had been opened since the date of the initial audit. This debit, in the amount of $901.43, was created on October 22, 1981, when respondent drew a check on behalf of a client, James Davis, without first collecting or depositing covering funds.

Based upon the foregoing, the committee found that respondent had failed to carry out contracts of employment and to represent his clients zealously, in violation of *DR* 7–101; engaged in conduct which adversely reflected on his fitness to practice law, in violation of *DR* 1–102; and had failed to preserve the identity of funds belonging to a client or to comply with the provisions of *R.* 1:21–6, in violation of *DR* 9–102.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the committee in finding the respondent guilty of unethical conduct are fully supported by clear and convincing evidence. Respondent's conduct in these matters constituted violations of *DR* 1–102(A)(1), (3), (4), and (6); *DR* 6–101(A)(1); *DR* 7–101(A)(1), (2) and (3); *DR* 7–102(A)(3), (5), and (8) and *DR* 9–102.

When respondent was retained by his clients, he owed each of them a duty to pursue their respective interests diligently. *Matter of Smith*, 101 *N.J.* 568, 571 (1986); *Matter of Schwartz*, 99 *N.J.* 510, 518 (1985); *See In Re Goldstaub*, 90 *N.J.* 1, 5 (1982). The record clearly indicates, that with the exception of some initial activity, respondent totally disregarded his obligation to his clients.

The Seaman matter involved a relatively simple real estate transaction. Upon completion of the closing, respondent's sole responsibility was to draft and file a new mortgage and deed reflecting the correct metes and bounds description of the property. Yet, four years later, he had not done so. As a result of respondent's negligence, the Seamans lost their homestead exemption for the years 1981 through 1984. Mr. Seaman's parents were also prevented from reporting their capital gain to the Internal Revenue Service.

Similarly, the Leighton matter involved an uncomplicated quiet title action. In fact, respondent repeatedly advised his client that the matter could be resolved in a matter of months.

Yet, respondent categorized Mr. Leighton as a "nuisance." Consequently, with the exception of ordering a title search, respondent did nothing for four years. Mr. Leighton was ultimately left with no choice but to enter into a settlement agreement conceding a majority interest to an individual with a competing claim to the property.

The Scott matter involved a suit for damages to be filed against the Old Bridge Sewer Authority. The statutory period within which to file a claim against the Township of Old Bridge or any of its political subdivisions had passed. Respondent had indicated that, while recovery was highly unlikely, a suit could be filed against the individual members of the Sewer Authority. Although Mr. Scott paid respondent a $1,000.00 retainer and urged him to file an action "as promptly as possible," respondent simply lost interest in the case and did nothing further.

The Huff matter also involved a straightforward real estate transaction. After the closing, respondent's sole responsibility was to ensure that the two private mortgages be satisfied and discharged of record and that Ocean Federal be provided with the required title insurance policy. It should not have taken two years to complete.

The Board is satisfied the record in this case supports a finding that respondent's conduct in these matters constituted gross negligence. In each instance, respondent initially performed work for his clients. He then lost interest in the matters. *In re Rigg,* 57 *N.J.* 288 (1970). Moreover, respondent ignored his clients' numerous requests for information. An attorney's failure to communicate with his clients diminishes the confidence the public should have in members of the Bar. *In re Stein,* 97 *N.J.* 550, 563 (1984). "In some situations, silence can be no less a misrepresentation than words." *Crispen v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 347 (1984).

Of greater concern to the Board is the fact that, in the Leighton and Scott matters, respondent repeatedly misrepresented the status of the case to his clients. Public confidence in

the Bar is diminished when an attorney misrepresents to his client that his case is proceeding smoothly when it is not. Clients should not continue to suffer the consequences of being told their case is under control when it is not. *In re Goldstein,* 97 *N.J.* 545, 549 (1984). Here, respondent misled or lied to his clients. *See Matter of Templin,* 101 *N.J.* 337, 340 (1985) (an attorney who lied to his client advising him the case was pending, after a default judgment had been entered for the attorney's failure to answer interrogatories or respond to the court, was suspended for one year); *In re Loring,* 73 *N.J.* 282, 285 (1977) (an attorney who informed a client that an appeal from the trial court's dismissal of an action filed out of time was pending, when the appeal had been dismissed due also to late filing, was suspended for six months). Respondent's conduct in this regard constituted a violation of *DR* 1–102(A)(4).

The record further indicates that there were shortages in respondent's trust account. However, the Board finds no evidence that respondent knowingly misappropriated clients' funds.

Misappropriation is "any unauthorized use by the lawyer of client's funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's·own purpose, whether or not he derived any personal gain or benefit therefrom." *In re Wilson,* 81 *N.J.* 451, 455 n. 1 (1979). The misappropriation that will trigger automatic disbarment "consists simply of a lawyer taking a client's money entrusted to him, knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 159–160 (1986).

Based on this record, the Board cannot find clear and convincing evidence that respondent knowingly stole or borrowed any of his client's funds. Rather, the Board is clearly convinced that respondent lost track of these funds as a result of his wholly inefficient bookkeeping and accounting practices.

"It is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using

client's trust funds." *Matter of Fleischer*, 102 *N.J.* 440, 447 (1986). However, respondent did not deliberately design an accounting system that would enable him to misappropriate his client's funds or practice in blissful ignorance that such funds could or would be invaded. Respondent's first job as a lawyer was with a title insurance company. He later joined a law firm as an associate, having nothing to do with the bookkeeping or financial aspects of the practice. He then became a partner, with no responsibility for the bookkeeping function. When the partnership was dissolved, he simply employed the bookkeeping system that had been used previously. As respondent testified, he

> ... didn't set up the trust ledger sheets ... that was the system I inherited from the firm of which I was a partner prior to its dissolution[.] [2T 90-17 to 19].[2]

He retained an accountant to reconcile his checkbooks with the bank statements on a monthly basis. However, the accountant did not prepare listings of the open client ledger balances or otherwise reconcile the trust account ledger sheets with the monthly bank statements. The audit indicated that, at times, there were some relatively minor shortages in respondent's trust account and that these shortages were not attributable to any particular client. Whatever shortages existed appeared to have been due to shoddy bookkeeping. The Board concludes that respondent's problems stemmed from flagrant record-keeping errors combined with an apparent lack of comprehension of the proper operation of an attorney's bank accounts. He apparently failed to recognize or understand that "part of [his] responsibility to the legal system is the maintainance and supervision of accounting records." *Matter of Orlando*, 104 *N.J.* 344, 350 (1986).

The Board concludes that, while the record clearly evidences flagrant record keeping violations, a finding of knowing misap-

---

[2] 2T denotes the transcript of the hearing before the district ethics committee on May 10, 1984.

propriation cannot be sustained by clear and convincing evidence. There was no rhyme or reason to respondent's being out of trust. *See Contra In re Brown*, 102 *N.J.* 512 (1986) (respondent, forced out of trust by a client's bad check then knowingly commenced and continued a pattern of borrowing from one client to satisfy another, was disbarred); *In re Lennan*, 102 *N.J.* 518 (1986) (where respondent who knowingly "borrowed" client funds for personal purposes was disbarred, even though affected clients ultimately ratified the "loans"); *In re Warhaftig*, 106 *N.J.* 529 (1987) (where respondent was disbarred for knowingly withdrawing anticipated but unearned fees, thus drawing against other clients' funds). But see *In re Perez*, 104 *N.J.* 316 (1986) (respondent issued trust checks which were returned for insufficient funds because he "forgot" that $4,000.00 cash, representing trust funds never properly deposited, had been stolen from his home; coupled with other serious escrow violations, he was suspended for two years).

The purpose of discipline is not the punishment of the offender, but "protection of the public from the attorney who cannot or will not measure up to the high standards of responsibility required of every member of the profession." *In re Getchius*, 88 *N.J.* 269, 276 (1982), citing *In re Stout*, 75 *N.J.* 321, 325 (1978). "The severity of discipline to be imposed must comport with the seriousness of ethical infractions in light of all the relevant circumstances." *In re Nigohosian*, 88 *N.J.* 308, 315 (1982). Therefore, mitigating factors are relevant and may be considered. *In re Hughes*, 90 *N.J.* 32, 36 (1982).

In this regard, the Board notes that respondent, a member of the Bar since 1964, has no record of prior discipline having been sustained against him. However, although the respondent has admitted to the conduct alleged in the complaint, he has offered no evidence in mitigation thereof. Accordingly, an eight member majority of the Board recommends that respondent be suspended from the practice of law for a period of one year. One member would impose a three- to six-month suspension.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.