573 A.2d 899

IN THE MATTER OF LOUIS B. YOUMANS, AN ATTORNEY AT LAW.

Argued January 30, 1990—Decided May 18, 1990.

*Paula T. Granuzzo*, Deputy Ethics Counsel, and *Richard J. Engelhardt*, Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Louis B. Youmans* argued the cause *pro se*.

PER CURIAM.

This attorney-disciplinary proceeding arises out of two presentments filed by the District VII Ethics Committee (Ethics Committee) concerning six separate complaints lodged against respondent, Louis B. Youmans. Following a determination by the Ethics Committee, the Disciplinary Review Board (DRB or Board) concluded that respondent had engaged in unethical conduct. The Board unanimously recommended that respondent's license to practice law be suspended for a period of two years.

Pending final resolution of the matter, the Office of Attorney Ethics petitioned this Court for an order seeking temporary

suspension of respondent. That petition was prompted by respondent's failure to comply with various Fee Arbitration Committee determinations directing him to refund monies to clients, and by an intervening indictment charging Youmans with one count of conspiracy to commit theft by deception and five counts of bad-check offenses. We granted the order seeking temporary suspension.

Our independent review of the record leads us to conclude that respondent's ethical violations have been established by clear and convincing evidence. We further conclude that the period of suspension recommended by the Board appropriately reflects the seriousness of respondent's misconduct.

I.

Respondent was admitted to the bar of this State in 1977. In 1983, Mr. Youmans formed a professional corporation for the purpose of practicing law, in which he was the sole shareholder. By February of 1985, Youmans' law practice was beset with financial difficulties. On May 29, 1985, the corporation filed a voluntary petition for reorganization pursuant to Chapter 11 of the Federal Bankruptcy Act, 11 *U.S.C.A.* § 301 (1979). In January 1986, a trustee was appointed to take over the operation of the firm, and the Chapter 11 proceeding was converted to a Chapter 7 Bankruptcy, 11 *U.S.C.A.* § 1112 (1979). Thereafter, respondent began an unincorporated sole practice in Shrewsbury. Respondent later moved his office to Manasquan.

Respondent's financial problems led to the complaints filed against him by several clients and a former associate of the Youmans firm. The DRB reviewed the findings of the Ethics Committee, which were summarized in the following manner:

### The Puckett Matter

In June, 1984, Respondent was engaged by Mrs. Patricia Puckett and her son, Andrew Marshall Puckett, to defend Mr. Puckett in connection with his indictment on criminal charges. The bills for respondent's services were paid by

Mrs. Puckett, and the representation continued until terminated by her by letter of January 28, 1986, subsequent to the filing of the grievance in this matter.

In August of 1985, Respondent told Mrs. Puckett that his firm (a professional corporation) was experiencing financial problems because, although the firm had plenty of receivables, clients were not paying bills in a timely fashion.

In August, September and October, 1985, Respondent and Mrs. Puckett frequently discussed both her son's case and the firm's finances. Mrs. Puckett told Respondent that her son John had $35,000 in savings, and the possibility of respondent's firm borrowing this sum was discussed.

In or about November, 1985, Respondent advised Mrs. Puckett of an immediate cash-flow problem which might cause his firm to be unable to meet its payroll. Mrs. Puckett volunteered to loan respondent $2,500 at no interest for two or three weeks.

Respondent accepted Mrs. Puckett's offer of a loan, which was repaid about four weeks later.

On December 2, 1985, Respondent called Mrs. Puckett and said that his firm needed funds because of a $10,000 'bank error'. In fact, the problem was a difference between respondent's projection of the firm's bank balance and the reality, due to some client checks which were returned for non-sufficient funds. Respondent told Mrs. Puckett that money was needed to pay a malpractice insurance premium, without which the firm could not continue in practice. He solicited Mrs. Puckett's help.

Mrs. Puckett told Respondent that her son John (aged 18) might be able to loan money to the firm. She made a point of the fact that other loans made by John had not been repaid, and that she wanted to be certain that did not happen again. Respondent assured Mrs. Puckett that any loan from John to his firm would be repaid. Mrs. Puckett thereupon spoke to John and arranged for him to loan $5,000 to respondent's firm.

On December 3, 1985, Mrs. Puckett brought a check for $5,000 to respondent's office. She again requested assurances that her son John would be repaid, which respondent gave. He executed a note on behalf of his firm, promising to repay the $5,000 together with 25% interest on December 24, 1985.

On May 29, 1985, Respondent's firm had filed a petition pursuant to Chapter 11 of the Federal Bankruptcy Act. At the time of the loans made by Mrs. Puckett and her son, the firm was operating as a debtor-in-possession. Loans made to the debtor-in-possession, if it could not successfully reorganize under Chapter 11, would be subordinated to the claims of the firm's secured creditors.

At no time prior to December 3, 1985 did Respondent mention the word "bankruptcy" to any member of the Puckett family. Although Respondent claims to have discussed the Chapter 11 proceeding with Mrs. Puckett, by his own admission he did not mention 'bankruptcy' because he 'doesn't consider a Chapter 11 a bankruptcy.' By Respondent's further admission, he did not explain to Mrs. Puckett the effect on her son's loan if the Chapter 11 proceeding was converted to a Chapter 7 proceeding, which was done at the Trustee's direction on or about January 21, 1986....

Respondent traded on Mrs. Puckett's lack of legal and financial sophistication, her concern for the continued representation of her son Andrew Marshall in the criminal proceeding against him, and her trust in the confidential relationship to Respondent, in obtaining the $5,000 loan from John Puckett at a time when, to respondent's knowledge, his firm's ability to repay the loan was seriously in doubt.

Mrs. Puckett went to see Respondent on December 24[sic], 1985, at which time he advised her that there were no funds available to repay the $5,000 loan.

On or about Thursday, January 2, 1986, in response to her repeated inquiries, Respondent gave Mrs. Puckett a check drawn on the firm's account in the amount of $5,141.17, to repay the loan from her son John. Respondent asked Mrs. Puckett to hold the check until the following Monday. On Monday, January 6, he called Mrs. Puckett to ask that she further delay depositing the check, but Mrs. Puckett had already gone to the bank and done so.

By notice of January 8, 1986, the bank returned Respondent's firm's check for non-sufficient funds.

At the time of giving Mrs. Puckett this check, Respondent had substantial doubts that there would be sufficient funds to cover it.

When Mrs. Puckett advised Respondent that the check had been returned, he admitted the firm had no funds to cover it. Later, he suggested to Mrs. Puckett that John Puckett file a claim with the Bankruptcy Court.

After Mrs. Puckett filed an ethics grievance, Respondent repaid the $5,000 loan, with interest, from personal funds over a period of several months.

## The Basaman Matter

In April 1985 respondent was retained by Mr. Basaman to represent him in a series of legal actions, including four negligence cases and one Title VII discrimination suit. The Title VII suit was filed on or about October 4, 1985 against the United States Postal Service and 14 other defendants. As of the date of the filing of the ethics complaint by Mr. Basaman, August 20, 1986, only nine of the defendants had been served. Mr. Basaman had paid respondent the sum of $5,000 in April 1985, which respondent characterized as a non-refundable retainer for representation in the Title VII case. Between April of 1985 and the filing of the complaint in October 1985, no effort was made to obtain injunctive relief on behalf of Mr. Basaman. Respondent testified that this delay occurred as a result of his waiting for Mr. Basaman to advise him of the names of other individuals who were to be joined with Mr. Basaman as plaintiffs in the matter. He further testified that he finally filed the complaint in October 1985 in order to preserve the cause of action against the running of the statute of limitations.

Mr. Basaman, however, testified that his purpose in paying the $5,000 to respondent in April of 1985 was to obtain immediate legal assistance. He was to be the only plaintiff and he did not want to delay the suit until others were joined as plaintiffs.

Ultimately, the Title VII suit had to be taken over by another attorney, and at that time was dismissed for failure to serve all the defendants. Thereafter, the case was reinstated, but subsequently again dismissed on motion of the United States Attorney addressed to the running of the statute of limitations.

The panel accepted as credible the testimony of Mr. Basaman and rejected that of respondent. It is the panel's conclusion that respondent's acceptance of the representation of Mr. Basaman in April 1985, and failure to file a complaint until October 1985, and thereafter pursue service on all the defendants in that action, coupled with respondent's failure to obtain information or prepare necessary affidavits to obtain injunctive relief on behalf of Mr. Basaman, constituted gross negligence in his representation and is a violation of *R.P.C.* 1.1(a).

The panel further concludes that the same facts warrant a finding that respondent also violated *R.P.C.* 1.3, failure to use reasonable diligence and promptness in the representation of a client.

In December 1985, respondent called Mr. Basaman and advised him that he was in a financial crisis and required $3,500. On December 19, 1985 Mr. Basaman met respondent in respondent's office and gave him checks totaling $3,500 which had been obtained by Mr. Basaman as loans from several finance companies. Respondent told Mr. Basaman that the money would be used to pay his bills, particularly mentioning a telephone bill of about the same amount. Further, respondent said that he would make the payments on the loans taken out by Mr. Basaman. Finally he stated that the financial crisis he was in would end in January or February of 1986. None of the $3,500 has ever been repaid to Mr. Basaman or on his behalf to the finance companies.

At the time that Mr. Basaman gave this money to respondent, respondent had filed a proceeding under Chapter 11 of the United States Bankruptcy Code which, on January 23, 1987, was converted to a Chapter 7 proceeding. Mr. Basaman testified that respondent did not advise him of the bankruptcy proceeding at the time he gave him the $3,500, and that there was no question in his mind that he was making a loan to respondent which respondent had promised to repay. Mr. Basaman further stated that he made the loan in order to protect the Title VII case respondent was handling for him.

Respondent, on the other hand, testified initially that the money was not a loan but an additional retainer on the Title VII suit. He presented no document to the panel supporting his claim that the money was a retainer, nor did he make any effort to obtain from the attorney who had the file on the Title VII case any such documentation. He then testified that the $3,500 was accepted by him as a credit against a recovery in the first of the negligence cases that he was handling for Mr. Basaman. In addition, respondent stated that when he accepted the $3,500 from Mr. Basaman, he had given him no accounting of services rendered to date, that his firm had not requested any additional fees, and that Mr. Basaman had volunteered the payment of the money to him.

Responding to a question from the panel as to why respondent did not consider the $3,500 to be a loan if it was to be repaid from prospective fees in a negligence case, respondent testified that he simply never perceived it in that light. Finally, respondent testified that on December 19, 1985, when he took

the money from Mr. Basaman, and Mr. Basaman advised him that he had borrowed the money in order to provide it to respondent, respondent indicated that he could not take it, but then reconsidered because not to accept the money would not be fair to his staff and to Mr. Basaman. At the time he took the money respondent had a negative cash flow and had exhausted his credit.

Based upon the testimony, the panel concludes that the $3,500 was advanced by Mr. Basaman to respondent as a loan, and that respondent promised to repay the loan. The panel further concludes that the solicitation of such a loan without revealing the existing pressing financial circumstances, was misconduct under *R.P.C.* 8.4. Finally, the failure on the part of respondent to disclose to Mr. Basaman his financial circumstances at the time of the loan constituted dishonesty and deceit, also in violation of *R.P.C.* 8.4.

The panel finds no evidence to support a violation of *R.P.C.* 3.1 (frivolous claim).

## *The Hayakawa Matter*

The complainant in this matter is an attorney of the State of New Jersey who, at the time of the incident in question, was working in respondent's law office. Complainant testified that she entered into a retainer agreement with a client of the office, the Moorish Science Temple of America, numbers 10 and 48, under an arrangement whereby a $1,000 retainer would be held in the firm's trust account and drawn against only as time was expended on behalf of the client. Upon receipt of the $1,000 respondent did not deposit the check in his trust account but rather into his attorney's account. While complainant and respondent differed in their testimony on the facts, it is the panel's conclusion that the testimony of the complainant was more credible.

Complainant said that just before November 1985, the client asked the firm to review its corporate documents and obtain an Internal Revenue Service nonprofit exemption status for it. She testified that respondent had told her to obtain a retainer, and she said she would seek such a retainer, but that it would have to be deposited in the firm's trust account because the services for which it was to be rendered had not yet been performed. She was concerned that if the money did not go into the trust account, it would be spent immediately because of the pressing financial situation of the firm. The retainer of $1,000 was received by the firm in November 1985, but complainant did not learn the money had been received until late December 1985. When she discovered that the money had been paid, she also found out that the money had not been put in trust, in violation of the retainer agreement made with the client. She also testified that respondent told her he had deposited the money in the bank.

Respondent initially testified that he was not aware of the retainer agreement with the Temple until January 14, 1986. The panel finds, contrary to that testimony, that respondent was or should have been aware of the terms of the retainer agreement at the time of the earlier bank deposit. Complainant testified specifically that prior to the receipt of the check she had told respondent that it was to go into the trust account. Also a copy of the client ledger card * * * clearly indicates that the money received was considered as un-

earned. In his testimony respondent asserted unequivocally that he was the person to whom all checks were directed at this time because of the difficult financial circumstances of his firm. The panel does not accept respondent's testimony that a signed retainer agreement that was returned to the firm by the client was not with the check when he deposited it.

With respect to this charge respondent admits that there was at least a technical violation of *R.P.C.* 1.15.

Based upon the testimony and the evidence submitted the panel concludes that respondent violated *R.P.C.* 1.15 in knowingly not holding client's property separately from his own when he was under obligation to do so.

## *The Hopkins Matter*

Ms. Hopkins testified that in July 1985 she asked respondent to represent a friend of hers in the appeal of a criminal conviction, for which work she would pay the fees. Initially she spoke to an associate of respondent's law firm and was advised that the fee would be $5,000 plus $400 for each court appearance. Complainant advised the firm, both by letter and in several telephone calls, that she could not afford the fees. Finally, in response to a telephone call from respondent, the complainant went to respondent's office and gave him a check for $2,500. On that visit, after she had given him the check, he told her he needed an additional $1,200 to purchase a transcript. Complainant advised respondent that she could not afford the additional money and demanded her $2,500 check back, but respondent refused to return it. The next day complainant stopped payment on the check and advised respondent of her action. Respondent advised her that she could not take this action and that he had prosecuted people criminally for doing so. Complainant thereupon issued a new check for $2,500 to respondent. At the time complainant told respondent that she had stopped payment on the check, respondent replied to her that he had already begun his services to her friend. Complainant told respondent she would pay him for the work done to date but respondent did not answer.

Respondent's testimony was limited to the visit at which complainant told him she had stopped payment on the check. He stated that he told her he had already done a lot of work, and did not understand how she could stop the check knowing that respondent's firm was 'on the hook' to go forward with the representation. He told her further that the firm was entitled to the check and would obtain it if necessary through suit against her. When asked by the panel whether complainant had requested the return of the first $2,500 check because she could not afford his services, respondent replied that he had not then perceived her to be asking for her money back, but on reflection believes that what she said could have been construed as indirectly requesting that the money be returned to her. He also conceded that he did tell complainant that he had prosecuted people criminally for stopping checks. Finally, in response to a panel question about whether complainant had offered to pay respondent for the services rendered to date at the time she told him she had stopped the check, respondent said she might have, although that offer did not deal with the commitment the firm had made to represent her friend.

Once again, the panel accepts the testimony of the complainant as more credible than that of the respondent. The panel concludes that respondent acted deceitfully in not immediately returning to complainant her first check for $2,500 upon request, and in hinting to her concerning criminal prosecution when she first advised him she had stopped payment on the check. The panel concludes that respondent's comments regarding previous prosecution constituted, to the complainant, a threat of criminal prosecution. The panel has no evidence to indicate the extent of the services rendered by respondent to complainant's friend or whether it was possible for complainant's firm to withdraw from the representation without the permission of the court. Its conclusion that respondent violated R.P.C. 8.4(c) by acting deceitfully is based upon respondent's not immediately returning the check to complainant when she asked for it, and upon his acts of intimidation to the complainant by his threat of criminal prosecution in order to secure a replacement check for the one stopped by complainant.

## The Caprario Matter

The complaint alleges that in May 1985 complainant hired respondent to represent her in a sexual discrimination matter; that a counterclaim on behalf of complainant was not filed until July 19, 1985; that complainant received numerous telephone calls from respondent in which respondent discussed his own personal and financial problems; that although complainant agreed with respondent to pay a retainer of $5,000 plus a contingent fee of one-third of the monies collected on the counterclaim, she received a bill for further legal services from the respondent; that respondent was frequently unable to advise her of the status of her case or answer questions concerning the case; that respondent's correspondence was unclear and that interrogatories were not filed in a timely manner.

The evidence in this case, and the testimony taken before the panel, substantiates complainant's unhappiness with the quality and the caliber of the work performed by respondent. The evidence does not, however substantiate by a clear and convincing standard the charges of unethical conduct ...

## The Pugh Matter

Ms. Pugh testified before the panel that her malpractice case had been settled by the respondent for $42,000 and that she had gone to the respondent's office and signed the necessary release. When the respondent received the check, he again called Ms. Pugh to come to his office and endorse it. She told him she could not leave work to do so. Respondent asked her if he could sign her name to the check and she said yes. However, she called him back immediately thereafter and instructed him not to sign the check, and that she would come up to his office to do so in person. Instead, respondent arranged to meet her at a restaurant. She went to the restaurant with three friends, but respondent did not appear. She then went to his office with these friends and met with the respondent. He did not have the check and when she asked for some proof of

its receipt, he showed her a deposit slip. He then grabbed the document from her hands and ordered complainant and her friends out of the office.

There is no allegation that respondent did not send to complainant the monies due her. He sent her a certified check for her share of the proceeds, and a disbursement statement showing the disposition of the total proceeds. Further, she said he called her and apologized for his behavior in the office.

Respondent's testimony differs somewhat from complainant's. He said that when he called complainant to advise her about receipt of the check, he also advised that the banking laws of New Jersey permitted him to sign her name with her permission. She then authorized respondent to sign her name. According to respondent, Ms. Pugh did not call him back that day to tell him she changed her mind and wanted to sign it herself, but called him back the next day. He testified that the consecutive dates in question were March 18 and March 19, 1986. Respondent attempted to establish the two different dates by introducing into evidence time charge records. In fact, these time charge records appear to support the conclusion that Ms. Pugh called respondent to advise him of her desire to endorse the instrument on March 18 and not on March 19. However, the panel finds that it makes no difference which of the two dates Ms. Pugh called respondent, since he testified that he did not receive the settlement check until March 19, 1986.

In response to questions from the panel, the respondent testified that he had received permission from Ms. Pugh on March 18 to sign her name to the check, and did so on March 19, pursuant to that permission, but did not deposit the check until after Ms. Pugh called him back and said that she wanted to sign the check herself after all. He further acknowledged that he deposited the check with only his endorsement of Ms. Pugh's name. The panel finds that in weighing the credibility of the respondent and the credibility of the complainant, it is the complainant who is telling the truth. We believe that the complainant called the respondent back and revoked her authorization to him to endorse her name to the check on the same day on which she had earlier given that authorization. Notwithstanding the withdrawal of the complainant's authorization, respondent deposited the check. This factual pattern is clear even if we accept the testimony of the respondent. He deposited the check with his endorsement of complainant's name after she had withdrawn her authorization to him to sign it on her behalf.

The panel finds that this action by respondent violated R.P.C. 8.4(c). It is our opinion that this action involved deceit toward complainant, and also constituted fraud and misrepresentation to the insurance company that the proper endorsement was on the check at the time of its negotiation."

The DRB concluded that the determinations of the Ethics Committee, finding respondent guilty of unethical conduct in the Puckett, Basaman, Hopkins, Pugh, and Hayakawa matters, were fully supported by clear and convincing evidence. We agree. Specifically, respondent's conduct in these matters constituted violations of RPC 8.4(c), RPC 1.1(a), RPC 1.3, and RPC

1.15. With respect to the Caprario matter, the Committee concluded that there was not clear and convincing evidence that respondent engaged in unethical conduct. The Board did not disturb the Committee's determinations concerning the Caprario matter, nor do we. Likewise, we leave undisturbed the Board's conclusion that there is insufficient evidence that respondent engaged in a pattern of neglect.

## II.

### A.

In the Puckett and Basaman matters, Youmans solicited and obtained unsecured loans from clients, at a time when his ability to repay those loans was seriously in doubt. Respondent failed to advise the lender-clients to seek independent counsel, and failed to disclose the rapidly deteriorating financial condition of his law firm.

This Court has recently reaffirmed the well-settled principle that an attorney is ethically required to advise clients to obtain independent counsel before making a loan to that attorney. *In re Pascoe*, 113 *N.J.* 229, 549 *A*.2d 1247 (1988). Indeed, we have recognized that as a general rule an attorney should refrain from engaging in transactions with a client who has not obtained independent legal advice on the matter in question. *See, e.g., In re Hurd*, 69 *N.J.* 316, 354 *A*.2d 78 (1976). As Justice Jacobs observed, "[a]n attorney who enters into business ventures with his client does not, in the eyes of his client or the public generally, shed in chameleon fashion his professional standing and obligation * * *." *In re Carlsen*, 17 *N.J.* 338, 346, 111 *A*.2d 393 (1955). Thus, it is clear that attorneys who enter into loan transactions with clients are "held to a higher standard than that of the market place * * * [and their] conduct must measure up to the high standards required of a member of the bar even if [their] duties in a particular transaction do not involve the practice of law." *In re Reiss*, 101 *N.J.*

475, 488, 502 *A.*2d 560 (1986). In this case, respondent's personal interest in obtaining loans from Mrs. Puckett and Mr. Basaman overcame his ethical obligation to advise the lenders to seek outside counsel.

Had Mrs. Puckett or Mr. Basaman consulted independent counsel, there is a high probability that the unsecured loans would not have been made. Clearly, a lawyer exercising ordinary care to protect the interests of these lender clients would have sought security for the loans made to respondent.

Youmans' misconduct was not confined to the failure to advise Mrs. Puckett and Mr. Basaman to seek independent counsel in connection with the loans made to respondent. Rather, we agree with the Board's finding that Youmans' failure to disclose fully the firm's status in the bankruptcy proceedings to these clients at the very outset of the loan transactions constituted misrepresentation and deceit contrary to *RPC* 8.4(c). (*RPC* 8.4(c) provides that "[i]t is professional misconduct for a lawyer to [ ] engage in conduct involving dishonesty, fraud, deceit or misrepresentation.) The omission of such highly pertinent facts severely prejudiced these clients. Both clients made clear that had they been informed of the true extent of respondent's financial situation, the loans would not have been extended to Youmans.

■ Respondent also acted deceitfully in his dealings with Ms. Hopkins and Mrs. Pugh, thereby committing additional violations of *RPC* 8.4(c). Ms. Hopkins hired Youmans to represent a friend in a criminal appeal. The parties agreed to a fee of $2,500. When Ms. Hopkins tendered a check for that amount, respondent informed her that an additional $1,200 would be required to obtain necessary transcripts of the proceedings below. Ms. Hopkins informed respondent that she was unable to afford this additional sum, and requested that Youmans return the $2,500 check already tendered. Respondent not only improperly refused to return the check, but compounded the situation by conveying to Ms. Hopkins a thinly

veiled threat of criminal prosecution on learning that she had stopped payment on the check. As a result of that threat, Ms. Hopkins continued in her relationship with Youmans. Respondent's conduct was clearly unethical.

■ With respect to the Pugh matter, in his attempt to receive his fee expeditiously, respondent signed his client's settlement check contrary to her stated desire to sign it herself. We agree with the DRB's conclusion that respondent's conduct in this regard constituted fraud and misrepresentation to the insurance company issuing the check, and deceit toward Mrs. Pugh.

### B.

■ Moreover, with respect to the Basaman matter, the Board concluded that respondent's handling of that client's federal Title VII action constituted gross negligence, contrary to *RPC* 1.1(a), and failure to use diligence in the representation of a client in violation of *RPC* 1.3.[1] That conclusion is amply supported by the evidence and comports with the requisite clear-and-convincing standard applicable in attorney-disciplinary matters.

In April 1985, Mr. Basaman retained respondent to represent him, *inter alia,* in a Title VII discrimination action against the United States Postal Service and fourteen other defendants. Respondent did not file the complaint until October 1985. Respondent also failed to make any efforts toward the procurement of injunctive relief on behalf of Mr. Basaman. Further, by the time Mr. Basaman filed an ethics complaint against respondent, Youmans had served only nine of the fifteen named defendants in the Title VII action. Ultimately, the client's

---

[1]The full text of *RPC* 1.1(a) reads that "[a] lawyer shall not [h]andle or neglect a matter entrusted to the lawyer in such a manner that the lawyer's conduct constitutes gross negligence." *RPC* 1.3 requires a lawyer to "act with reasonable diligence and promptness in representing a client."

cause of action was dismissed as untimely under the relevant statute of limitations. The record clearly indicates that Youmans obtained a substantial non-refundable retainer from Mr. Basaman, and thereafter made little or no effort to obtain redress for the client's employment-related complaints. It is clear on these facts that respondent breached the duty owed to Mr. Basaman to pursue that client's interest with diligence. *See, e.g., In re Cullen,* 112 *N.J.* 13, 19–20, 547 *A.*2d 697 (1988); *In re Smith,* 101 *N.J.* 568, 571, 503 *A.*2d 846 (1986); *In re Schwartz,* 99 *N.J.* 510, 518, 493 *A.*2d 1248 (1985). Without addressing the merits of Mr. Basaman's Title VII discrimination claims, we find, as did the DRB, that respondent's superficial handling of the matter, which ultimately resulted in the loss of the opportunity to litigate those claims, constituted gross negligence in violation of *RPC* 1.1(a).

## C.

Finally, in the Hayakawa matter, the Board concluded that respondent's failure to deposit pre-paid unearned legal fees, received pursuant to a written retainer agreement with a client, into a trust account to be drawn upon when services were performed on behalf of the client violated *RPC* 1.15, which requires an attorney to hold the property of his client separately from his own. Instead, Youmans used the money to pay bills. The Board was unable to conclude, however, that respondent knowingly misappropriated the Hayakawa retainer funds.

It is well settled that when an attorney knowingly and without authorization uses a client's money as his or her own, disbarment is the appropriate discipline. *In re Noonan,* 102 *N.J.* 157, 506 *A.*2d 722 (1986); *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). There is no logical distinction between misappropriating funds from a trust account and failing to deposit funds into the appropriate trust account when there is an obligation to do so. Our careful review of the record leads us to agree with the Board's determination that there was insuffi-

cient evidence to show that respondent knew of the retainer agreement between Ms. Hayakawa and the client. Although there was no knowing misappropriation in this case, we conclude that Youmans conduct constituted a technical violation of *RPC* 1.15 and was improper. This Court has previously disciplined attorneys who fail to keep client property separate from the lawyer's own property although such conduct does not rise to the level of a knowing misappropriation. *Cf. In re Grabler*, 114 *N.J.* 1, 552 *A.*2d 596 (1989) (discipline warranted where attorney lost track of client funds as a result of inefficient bookkeeping and accounting practices); *accord In re Gill*, 114 *N.J.* 246, 553 *A.*2d 1337 (1989). Discipline is warranted in the present matter as well.

### III.

■ Having concluded that respondent has been guilty of numerous ethical infractions, the only issue left to consider is the quantum of discipline. The Board unanimously recommended that respondent be suspended from the practice of law for a period of two years. The Board cited respondent's lack of candor before the Ethics Committee and a private reprimand administered to respondent as aggravating factors it considered in reaching its recommendation. *See In re Gavel*, 22 *N.J.* 248, 125 *A.*2d 696 (1956). (Respondent was privately reprimanded on October 2, 1985 for conduct involving deceit under *DR* 1–102(A)(4) and (6).) The Board was unpersuaded that evidence of respondent's financial difficulties mitigated the severity of his unethical conduct. In this regard, the Board made clear that the public's confidence in the integrity of the bar would be undermined by treating leniently an attorney who "exhibited a willingness to close his eyes to accepted standards of professional conduct in order to protect his own financial success."

We are in accord with the findings of the DRB and its recommendation. In view of the severity of the multiple ethical violations committed by respondent, we order that respondent

be suspended from the practice of law for a period of two years. In addition, we adopt the Board's recommendation directing that the Office of Attorney Ethics conduct a further audit of respondent's accounts. Finally, we note that respondent is under investigation by the Office of Attorney Ethics with respect to other matters. *Supra* at 625. Restoration to practice shall be dependent on the disposition of those matters. Respondent shall also reimburse the Ethics Financial Committee for administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that LOUIS B. YOUMANS of MANASQUAN, who was admitted to the bar of this State in 1977, be suspended from the practice of law for a period of two years, effective immediately and until further Order of this Court; and it is further

ORDERED that LOUIS B. YOUMANS reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that LOUIS B. YOUMANS be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that LOUIS B. YOUMANS comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.