IN THE MATTER OF VINCENT F. X. CARLSEN, AN ATTORNEY-AT-LAW.

Argued December 13, 1954—Decided January 31, 1955.

*Mr. Milton T. Lasher*, by direction of the court, argued for the order to show cause.

*Mr. Reynier J. Wortendyke, Jr.*, argued in opposition to the order to show cause.

The opinion of the court was delivered by

JACOBS, J. The respondent Vincent F. X. Carlsen, an attorney-at-law, is charged with conduct violating the canons of professional ethics. Testimony was taken before the Bergen County Ethics and Grievance Committee and the respondent has been heard fully.

In January 1951 Mr. Doyle E. Bush visited Carlsen's law office. He had been a client for several years and his visit related to a legal matter which Carlsen was handling for him. While he was there Carlsen inquired whether he would be interested in a business proposition relating to the purchase of distillery property in Puerto Rico. Carlsen gave him a letter dated January 27, 1951 from David Lubben (another client of Carlsen) which described the property generally and stated that its seller was offering it for sale at the price of $75,000. Bush put the letter in his pocket and told Carlsen that he would read it and let him know what he thought about it. During a later visit he told Carlsen he was interested in the distillery matter and Carlsen

thereafter arranged a trip to Puerto Rico. He introduced Bush to Lubben and the three of them inspected the property and signed a written agreement (dated February 24, 1951) for its purchase; Bush testified that Lubben indicated to him that the seller's price was firm and that no reduction was obtainable. Under the terms of the agreement the Yabucoa Molasses Company, Inc. agreed to sell the property to Bush, Carlsen and Lubben, or a corporation to be formed by them, for $75,000, to be paid as follows: $7,500 deposit upon the signing of the agreement, $42,500 upon the delivery of title, and a first mortgage of $25,000 for the balance. Bush testified that in his discussions with Carlsen and Lubben it was understood that if he "put in $25,000, they would invest $12,500 each and I would be a half owner of the property and they 25 percent owner each"; they also talked of forming a Puerto Rico corporation and for his $25,000 Bush "would get 25,000 shares of $1.00 par value; Mr. Carlsen 12,500 shares for $12,500 and Mr. Lubben, 12,500 shares for $12,500." When the agreement was signed Bush delivered his check for $3,750 representing 50% of the deposit payment of $7,500; he testified that at that time "Mr. Carlsen told Mr. Lubben to pay his share and he would pay him back; and Mr. Lubben, I assume, had a check and handed it to either the closing attorney or the seller." In fact, Lubben did deliver a check for $3,750 purportedly representing the remaining 50% of the deposit then payable.

In March 1951 Carlsen, Lubben, Bush and Esteve, a Puerto Rican attorney, formed United Industries of Puerto Rico, Inc. to take title to the distillery property. The articles of incorporation set forth that the number of shares subscribed for and the amount of subscriptions paid in by the incorporators were as follows: Bush, 25,000 shares—$25,000; Carlsen, 12,500 shares—$12,500; Lubben, 12,500 shares—$12,500; Esteve, 1 share—$1. Bush suggested that the property should be paid for by the corporation but in a letter dated March 28, 1951 Carlsen advised that he thought "payment should be made by all of us as individuals and let

the corporation acquire it from us." In another letter dated March 28, 1951 Carlsen told Lubben that he did not want the corporation to make payment for the property, and that "payment should be made by the individuals named in the contract and the mortgage should be given by the corporation." On April 9, 1951 there was a closing pursuant to the agreement of sale. Carlsen did not attend but Bush, Lubben and Esteve were there as well as Nestor Rigual, president of the seller, Yabucoa Molasses Company, Inc. A deed was executed transferring title directly from the seller to United Industries. Bush delivered his check for $21,250 and, according to his testimony, "Mr. Lubben was supposed to have his and Mr. Carlsen's share, and he turned the check over, whatever it was, to either the closing attorney or the seller." In fact, Lubben did deliver his check for $21,250 purportedly representing 50% of the sum of $42,500 then payable under the agreement of sale. Bush testified that he at all times understood that Lubben and Carlsen were contributing $12,500 each to match his $25,000; that he would not have gone into the deal if he had known Carlsen was not actually putting up $12,500; and that he knew nothing about distilleries or Puerto Rican real estate values and "went along because these fellows were putting cash into it." Following the closing, Bush received a letter dated April 11, 1951 from Carlsen stating that he was "very happy" about the distillery deal; the same letter referred to unrelated legal matters then being handled by Carlsen for Bush.

Bush testified that when he originally decided to participate in the venture, Carlsen told him that he would readily obtain working capital of $25,000. Carlsen did arrange to have his client Maggiolo invest $12,500 for 12,500 shares of stock in United Industries; and under date of April 20, 1951 Carlsen wrote a letter to Bush enclosing check for $12,500 together with "corporate resolution and signature cards which are necessary in order to authorize you to open an account at the Chase National Bank." In this letter Carlsen stated that he had not encouraged the investment

of more than $12,500 because he did not believe it wise "to diminish our interests by the disposition of stock to others in return for investment"; he stated further that "the total amount now paid into the corporation" including the amount advanced by Maggiolo, "is now $62,500." In May 1951 Lubben sold his stock in United Industries to Bush in a transaction which involved a conveyance to Lubben of certain Maywood, New Jersey, property then owned by Bush. Carlsen represented Bush in this transaction and, subsequently, in other legal matters of minor nature. Carlsen never sought or received a legal fee in connection with any part of the Puerto Rican venture; he apparently considered himself as a co-principal with Bush and Lubben and the local legal matters were passed upon by the Puerto Rican attorney.

Things did not go well with the Puerto Rican venture and the distillery was never put into operation; it was unsuccessfully offered for sale. When the corporate funds were virtually depleted Bush, Carlsen and Maggiolo made contributions; Bush testified that these aggregated approximately $1,700 and were made proportionately in accordance with their then stockholdings in United Industries—*i. e.*, Bush—60%; Carlsen—20%; Maggiolo—20%. Foreclosure proceedings were instituted by the seller but they were apparently withdrawn when Carlsen arranged for payment sufficient to remove the default. In the meantime Bush apparently learned for the first time that Carlsen had never actually contributed his original $12,500 (or any portion thereof). Indeed, it now appears that neither Lubben nor Carlsen nor any one else ever contributed the $25,000 (or any portion thereof) which purportedly had been paid for an original 50% interest matching Bush's original interest in the Puerto Rican venture.

Pursuant to this court's order, dated June 16, 1954, depositions of Nestor Rigual and David Lubben were taken in Puerto Rico. Rigual testified that as president of Yabucoa Molasses Company, Inc. he had given Lubben an option "to sell" the distillery property for $50,000 and that all

"he could get over and above $50,000 would be his commission." He testified that although he had received Lubben's checks for $3,750 and $21,250, they were actually returned to Lubben after the closing; in addition he gave Lubben "$3,000 for expenses." Lubben confirmed the foregoing, testifying that Rigual had returned to him "the two checks I had given him in the amount of $25,000" and had also paid him $3,000. Lubben testified that "I told Mr. Carlsen that I had an option for the sale of this property at $50,000 and that I would also get $3,000 for expenses," and "I told the owner I could not very well go back and forth and sell this property for $3,000 commission, and he agreed that anything over the $50,000 I could have." He also testified that he told Carlsen that he "would make the arrangement with him the same as with any other New York broker, in other words, to divide the profits." Rigual had testified that he had never spoken to Carlsen about his private arrangements with Lubben and that as far as he knew Carlsen did not know about them. After the testimony of Rigual and Lubben was taken, Carlsen was given opportunity to testify further but declined to do so, preferring instead to rely on the earlier testimony relating to the Puerto Rican venture given by him before the ethics committee on three separate occasions, namely, August 7, 1953, September 11, 1953 and February 11, 1954.

. During the August 7 hearing Carlsen testified that Lubben "introduced me and two of my clients to a distillery piece of property in Puerto Rico, which collectively we purchased. Mr. Lubben has no interest in that. He acted as a broker in acquiring the property." Later during the same hearing he testified that after United Industries was formed and the distillery was transferred to it, Lubben "conveyed his stock" to Bush and "Lubben put no money into that enterprise." During the September 11 hearing Carlsen testified that in February 1951 he, Bush and perhaps Lubben looked at the distillery property in Puerto Rico; that United Industries was formed; and that the "amount of money to be paid into

the corporation was $50,000 of which $25,000 was subscribed by Mr. Bush, $12,500 was subscribed by myself, and $12,500 was subscribed for by Mr. Lubben." Carlsen admitted that his subscription of $12,500 was never paid in whole or in part; at one point he testified that he told Bush that he "didn't have any money" and that Bush said, "Well, you can put it in at any time. We will take care of that end of it"; at another point he indicated that the venture did not look good enough for him to invest his own money and that he told that to Bush. He testified that he did not know how the $42,500 due at the closing was actually paid since he did not attend it with Bush and Lubben but that he knew Bush "definitely was a man of means, and I felt that he also had sufficient assets, and between the two of them they would take care of it, which they did." Insofar as payment for his 12,500 shares was concerned, he stated that "if demand was made upon me to put it in, I would put it in, when I could afford to put it in. In other words, before any distribution of profits of that corporation, I would be given the credit for the amount I had actually put in and then any balances remaining would be off-set for any distribution of any kind."

Carlsen's final testimony was taken before the ethics committee on February 11, 1954. This was after Bush had completed his testimony and after Carlsen and Bush had entered into an agreement of settlement of a civil action in which Bush had charged that he had been fraudulently induced to participate in the Puerto Rican venture. The settlement agreement provided, subject to the terms and conditions set forth therein, that Carlsen would pay Bush the sum of $30,000; that Bush would discontinue his action against Carlsen and "waive any claim of fraud" against him; and that Bush would deliver his stock in United Industries to Carlsen. In response to questioning by the acting chairman of the ethics committee, Carlsen testified that Bush had put up $25,000, that a mortgage for $25,000 had been executed and that "Lubben was to put" up the remaining $25,000.

He testified further that he had told Lubben that he had no money to put into the venture and that Lubben told him he would "take care of that end of it" and would forego part of his "commission." He denied that Lubben was lending him any money but stated that Lubben "was foregoing part of the receipt of any commission he was to get to the extent of what my contribution would be." Later in his testimony Carlsen again stated that the reason he received 12,500 shares of the corporation was that Lubben was willing to forego part of his commission and have issued to Carlsen "shares which otherwise would have gone" to Lubben, and that as far as Bush was concerned, he could rightfully believe that Carlsen's shares "were paid in full."

 The ethics committee justifiably found that Bush was a credible witness and that Carlsen did not give "credible refutation of the crucial points of Bush's testimony"; and the testimony and exhibits before us leave no room whatever for doubting that Bush was induced to participate in the Puerto Rican venture by unscrupulous means which may not be tolerated even under market place standards. Compare *Lloyd v. Hulick*, 69 *N. J. Eq.* 784, 786 (*E. & A.* 1906), where Chief Justice Gummere observed that "in the transaction of business, men ordinarily deal with one another in the belief that each is honest." See *Gallagher v. New England, etc., Co. of Boston*, 33 *N. J. Super.* 128, 136 (*App. Div.* 1954). Carlsen does not now attempt to defend the means nor could he; his position seemingly is that the real wrongdoer was Lubben rather than he and that his own conduct did not violate any of the canons of professional ethics. He denies that there was ever any attorney-client relationship between Bush and himself insofar as the Puerto Rican venture was concerned, but we reject this position without hesitation. Bush was a general client and was brought to the venture by his general attorney. True, they thereafter both participated as principals but that did not remove the trust and confidence of their relationship. As their correspondence vividly portrays, Bush continued at all times to

place great reliance on Carlsen. An attorney who enters into business ventures with his client does not, in the eyes of his client or the public generally, shed in chameleon fashion his professional standing and obligation and there is no just reason why he should be permitted to do so. *Cf. In re Slawson,* 158 *App. Div.* 467, 143 *N. Y. S.* 594 (*App. Div.* 1913); *In re Beare,* 158 *App. Div.* 469, 143 *N. Y. S.* 595 (*App. Div.* 1913). In *In re Genser,* 15 *N. J.* 600, 606 (1954), this court expressly recognized that an attorney who wishes to be a business man must act in his business transactions with high standards and that his professional obligation reaches all persons who have reason to rely on him even though "not strictly clients." And in *In re Howell,* 10 *N. J.* 139, 140, 141 (1952), we approved the doctrine that conduct by an attorney which engenders disrespect for the law calls for disciplinary action even in the total absence of the attorney-client relationship.

In democracies there is no higher calling than the administration of justice in which attorneys play an important part. It is vital that they be honorable men, and in their professional work they are rightly held to high ethical and moral standards. Perhaps society would be better served if practicing attorneys were to remain full-time lawyers rather than become part-time business men. But, be that as it may, it seems evident that if they do choose to become part-time business men they must carry with them their elemental obligations of honesty, uprightness and fair dealing; the contrary view would grossly discredit our legal institutions and has been rightly rejected by courts throughout the country. In *Re Isaacs,* 172 *App. Div.* 181, 158 *N. Y. S.* 403 (*App. Div.* 1916), an attorney was disbarred for participating in a real estate sale which involved misrepresentations and loss to the purchaser. The finding was that he was cognizant of the misrepresentations and the absence of the professional relationship of attorney-client did not absolve him from his obligation to deal fairly and honestly in the transaction. In *Re Waleen,* 190 *Minn.* 13, 250 *N. W.* 798

(*Sup. Ct.* 1933), the respondent was suspended on the basis of charges which included misconduct in a business transaction not involving the attorney-client relation; in the course of its opinion the court noted that as an attorney the respondent was bound even in ordinary business transactions by more rigid rules of conduct "than would a lay person engaged in the conduct of his private business." In *Re Hansen,* 101 *Mont.* 490, 54 *P.* 2*d* 882 (*Sup. Ct.* 1936), the respondent was reprimanded and fined for misconduct in a transaction in which he contended he was acting as agent rather than attorney. In his opinion for the court Justice Morris summarily disposed of this contention as follows:

"Whether Hansen was acting in this matter as agent or as an attorney for the corporation we think is immaterial. There are decisions that make such distinction, but the great preponderance of authority 'and the sounder reasoning 'hold attorneys to the same sound practice in all transactions, whether professional or otherwise, and require of him in his private as well as his professional character the same standard of fair and upright dealing. This rule is founded on the unimpeachable ground that 'as good character is an essential qualification for an admission of an attorney to the bar, he can be removed whenever he ceases to possess such character' (6 *C. J.* 584), and is supported by numerous decisions. *State ex rel. Hartman v. Cadwell,* 16 *Mont.* 119, 40 *P.* 176, 181; *In re Wellcome,* 23 *Mont.* 140, 58 *P.* 45; *Id.,* 23 *Mont.* 213, 58 *P.* 47; *In re Thresher,* 33 *Mont.* 441, 84 *P.* 876, 877, 114 *Am. St. Rep.* 834, 18 *Ann. Cas.* 845; *Bartos v. United States Dist. Court,* *C. C.,* 19 *F.* 2*d* 722; *People ex rel. Healy v. Macauley,* 230 *Ill.* 208, 82 *N. E.* 612, 120 *Am. St. Rep.* 287; *Norfolk & Portsmouth Bar Association v. Drewry,* 161 *Va.* 833, 172 *S. E.* 282; *In re Wilson,* 79 *Kan.* 450, 100 *P.* 75; *Moore's Case,* 76 *N. H.* 227, 81 *A.* 703; *In re Young,* 75 *N. J. L.* 83, 67 *A.* 717; *Matter of Kalisky,* 169 *App. Div.* 531, 155 *N. Y. S.* 550; *Matter of Isaacs,* 172 *App. Div.* 181, 158 *N. Y. S.* 403; *Matter of Berkeley,* 174 *App. Div.* 205, 160 *N. Y. S.* 1093; *In re Holton,* 36 *R. I.* 114, 89 *A.* 242; *In re Turner,* 104 *Wash.* 276, 176 *P.* 332; *In re Waleen,* 190 *Minn.* 13, 250 *N. W.* 798; *People [ex rel.] v. Lotterman,* 353 *Ill.* 399, 187 *N. E.* 424; *State ex rel. Montgomery v. Estes,* 105 *Or.* 173, 209 *P.* 486; *In re Spriggs,* 36 *Ariz.* 262, 284 *P.* 521."

*Cf. In re Rothman,* 12 *N. J.* 528, 546 (1953); *In re Young,* 75 *N. J. L.* 83, 96 (*Sup. Ct.* 1907).

We are entirely satisfied from the record before us that, at very least, Carlsen engaged in conduct which violated the canons of professional ethics. In conformity with canon 6 he should, at inception, have told Bush all of the circumstances concerning his relations with Lubben in the Puerto Rican venture and his interest therein, and in conformity with canon 11 he should have at all times refrained from any action whereby, for his own benefit or gain, he either abused or took advantage of the confidence reposed in him by Bush. His conduct patently failed to meet these basic requirements of fair and decent conduct by attorneys. From the start he led Bush to believe that he and Lubben were each making *bona fide* payments of $12,500, thus matching Bush's acknowledged payment of $25,000. Bush joined the venture in reliance upon their matching investment and throughout the correspondence Carlsen conveyed the impression that it had been fully paid. In fact, it was not paid and Carlsen knew that he had never made any payment. Although he denies knowledge of Lubben's deception, he did testify that he knew Lubben was to receive a "commission" from which Lubben would pay Carlsen's share of $12,500 in full. This arrangement must have disclosed to him that the real purchase price was not $75,000 and that the purported arrangement of $50,000 cash payment—$25,000 by Bush, $12,500 by Lubben, and $12,500 by Carlsen—did not represent real disbursements by Lubben and himself to match the payment by Bush. If Lubben was to pay Carlsen's $12,500 out of the "commission" then it must, to Carlsen's knowledge, have been in excess of that amount and if, as it ultimately was disclosed, it reached or exceeded $25,000, then it was sufficient to cover Lubben's, as well as Carlsen's, purported investment. After the deceptive cloak is removed the result of Carlsen's arrangement with Lubben appears clearly— Bush was to make the only original investment in the venture with Carlsen and Lubben sharing half ownership in it. Carlsen testified that Bush was present when he made his arrangement with Lubben, but Bush's testimony is in denial

of knowledge thereof and the circumstances strongly support him. We are convinced that the existence and implications of the arrangement were never brought home to Bush and that, on the contrary, they were withheld by Carlsen for his personal gain and in abuse of the confidence reposed in him.

We find the respondent guilty of unprofessional conduct in the Puerto Rican venture. We express no opinion at this time on an independent charge that he failed to report, to the appropriate authorities, an alleged attempted extortion by a municipal attorney. See *State v. Weleck*, 10 *N. J.* 355 (1952). *Cf. Canon* 29; *Phillips and McCoy, Conduct of Judges and Lawyers* 99 (1952). The criminal proceedings against the municipal attorney have resulted in a conviction which is now the subject of an application for new trial and we consider it preferable that the subject not be dealt with here while that application is pending before the trial court.

The judgment of the court is that the respondent be suspended from the practice of law for the period of three years and until further order.

*For suspension for three years*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*For disbarment*—Chief Justice VANDERBILT, and Justice BRENNAN—2.