

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-6-1997

# Villanueva v. Brown

Precedential or Non-Precedential:

Docket 95-5072

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Villanueva v. Brown" (1997). *1997 Decisions.* Paper 5.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/5

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-5072

JACK VILLANUEVA, ADMINISTRATOR PENDENTE LITE
OF THE ESTATE OF ELLA OSTROFF,

Appellant

v.

G. MICHAEL BROWN; GUY MICHAEL; BROWN & MICHAEL;
GREENBERG MARGOLIS

HELEN CONN; SAMUEL RUBIN; JOSEPH RUBINSTEIN

Third Party Defendant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(Civil No. 92-CV-02268)

Argued MARCH 22, 1996
Before: BECKER and McKEE, <u>Circuit Judges</u>, and
POLLAK, <u>District Judge</u>[*]

(Opinion filed: January 8, 1997)

BRUCE S. MARKS, ESQ. (Argued)
Spector, Gadon & Rosen
1700 Market Street, 29th Floor
Philadelphia, PA 19103
<u>Attorneys for Appellant</u>

LAWRENCE P. ENGRISSEI ESQ. (Argued)
Law Offices of Thomas Dempster, III

---

[*] The Honorable Louis H. Pollak, United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

Centerpointe at East Gate
161 Gaither Drive, Suite 201
Mount Laurel, NJ  08054
Attorneys for Appellees, G. Michael
Brown, Guy Michael and Brown &
Michael

DAVID G. LUCAS, JR., ESQ. (Argued)
Wolff, Helies & Duggan
188 East Bergen Place
Red Bank, NJ 07701
Attorneys for Appellee, Helen Conn

KEITH L. ANDERSON, ESQ.
Law Office of Keith L. Anderson
Washington Professional Campus
728 Black Horse Pike, Suite B-2
Turnersville, NJ  08012
Attorney for Appellee, Samuel Rubin

JOSEPH RUBINSTEIN
501 White Horse Pike
Collingswood, NJ 08108
Appellee, Pro Se

_____

OPINION OF THE COURT

_____


McKEE, Circuit Judge

Jack Villanueva, Administrator *pendente lite* of the Estate of Ella Ostroff, appeals from a directed verdict in favor of the law firm of Brown and Michael, its partners: G. Michael Brown and Guy Michael (hereinafter the firm and its partners are collectively referred to as "Brown & Michael"), and Helen Conn, a notary.[1]  For the reasons discussed below, we will affirm the

_____

[1] As is noted below, Ella Ostroff died prior to the time this suit went to trial and Jack Villanueva was subsequently appointed administrator *pendente lite*. Accordingly, we will refer to the appellant herein as "the Estate."

judgment in favor of Brown & Michael, but will reverse the judgment in favor of Helen Conn, and remand for a determination of (1) whether Ostroff's acts constituted a ratification of the disbursements of her funds from the attorneys' trust account; and (2) whether -- if Ostroff's acts did not constitute ratification -- Conn's negligence caused injury to Ostroff and, if so, what damages ensued.

## I. Background

This case is about a sophisticated investor in the twilight of her years named Ella Ostroff, her accountant (Joseph Rubinstein), a "deal maker" (Samuel Rubin), a law firm (Brown and Michael), its two named partners, and a notary public (Helen Conn). The issues before us arise from Ms. Ostroff's involvement with, and investment in, a real estate project in St. Lucia.

The saga began in 1988 when Samuel Rubin was working on a project that was to become the St. Lucia Hotel and Casino (the "Project"). After concluding negotiations with St. Lucian government officials, Rubin entered into numerous agreements to incorporate the St. Lucia Hotel Corporation ("Corporation"). In the spring of 1989, Rubin began to look for "seed money" investors to pay Corporation expenses until the financing was in place. Joseph Rubinstein was an accountant at the time, and one of his clients was Ella Ostroff. The Estate claims that Rubinstein induced Ostroff to place $250,000 in the trust account of the New Jersey law firm of Brown and Michael. It is alleged that Rubinstein told Ostroff that Brown and Michael was the

Corporation's law firm, that her funds were to be used to pay ongoing Corporation expenses, and that the Project was a good investment opportunity for her. According to the Estate, although Ostroff had not met Rubin, she placed the money into the account pending receipt of additional information about the Project. The Estate also asserts that, sometime in April of 1989, Rubin and Rubinstein told Ostroff she would receive a 3% interest in the Project in return for her investment, and that her investment would be returned to her in stages.

Eventually, Rubin introduced Rubinstein to G. Michael Brown and Guy Michael, the named partners in the law firm of Brown and Michael. That firm represented Sam Rubin and the Corporation. Rubinstein informed Brown and Michael that he was Ostroff's accountant; however, he apparently did not represent himself to be Ostroff's financial or business advisor. Messrs. Brown and Michael were apparently aware that Rubinstein was the accountant for both Ostroff and the Corporation.

The instant legal dispute is rooted in a series of three checks that Rubinstein wrote between May 19, 1989, and June 26, 1989. Each of the checks was drawn on Ostroff's account, written by Rubinstein, signed by Ostroff, and made payable to, and deposited in, the Brown and Michael trust account. The checks were in the respective amounts of $25,000, $100,000 and $125,000. Brown and Michael did not inform Ostroff that they had received any of these checks nor did they obtain any agreement directly from Ostroff governing release of the proceeds. Brown and Michael assert that the money was deposited into their trust

4

account because no bank account had yet been opened in the Corporation's name. Brown and Michael asked Rubinstein to provide them with written consent from both Ostroff and Rubinstein giving them and the law firm the authority to disburse the funds from the trust account when requested by either Rubin or the Corporation.

After the first two checks had been deposited in the trust account, either Rubin or Rubinstein requested that the law firm release $25,000 of the proceeds. That request was not immediately honored, however, Rubinstein as Brown and Michael refused to release the funds without Ostroff's written approval. Consequently, Brown, Michael and Rubinstein agreed that a limited power of attorney would be furnished that would provide the requested authorization, and a limited power of attorney was prepared in mid June of 1989. The Estate contends that this limited power of attorney was prepared by Brown and Michael, not by Ostroff, and claims that Rubinstein arranged for Brown and Michael to receive the power of attorney directly, rather than giving it to Ostroff. Whether in fact Brown and Michael prepared the power of attorney is not clear; but it is clear that the power of attorney stated that Ostroff's name was "Della," rather than "Ella," in two different places.

Whatever may have been the provenance of the power of attorney, Rubinstein admitted that he signed Ostroff's name to it. However, claims that he signed Ostroff's name at her direction. Helen Conn, a notary public under the laws of New Jersey, admitted notarizing what purported to be Ostroff's

5

signature on that document as a favor to Rubinstein.  She concedes that she did so even though she did not witness the signature and did not know Ostroff.  The notarized limited power of attorney was then returned to Brown and Michael.

It is undisputed that Ostroff never signed the power of attorney and the Estate claims that she never authorized Rubinstein to sign for her.  The Estate also claims that when Brown and Michael received the limited power, they noticed the misspelling of Ostroff's first name and either they or Rubinstein corrected the misspelling with "white-out".

Under the terms of the limited power, Ostroff appeared to appoint Rubinstein her attorney-in-fact for the limited purpose of:
[a]uthorizing the law firm of Brown & Michael to
        release funds held by it, deposited by me, in
        its Attorney Trust Account.

(A1027).  In addition to the power of attorney, Brown and Michael also received a fax transmission of a letter from Rubinstein, dated June 15, 1989, authorizing Brown and Michael to release the funds from the firm's trust account upon Rubin's request.  The letter was addressed to Michael and stated in part:
You are hereby authorized to release funds from your
        firm's trust account, upon the request of Sam
        Rubin, for the use and benefit of St. Lucia
        Hotel Corporation.

(A1029).

Beginning on June 15, 1989, Brown and Michael issued a series of checks from their trust account pursuant to Rubin's requests.  The first check was in the amount of $25,000, the

second was for $25,000, and the third was for $200,000 which was the balance of Ostroff's funds.  Brown and Michael did not notify Ostroff of any of these disbursements, nor did they provide any accounting to Ostroff.  Rather, they relied solely upon the limited power of attorney, the fax from Rubinstein, and Rubin's requests that funds be released.

However, on July 27, 1989, an Investment Agreement "materialized."  That Agreement, which recites that it is between the St. Lucia Hotel Corporation and Ella Ostroff and which is apparently signed by Sam Rubin, as President of the Corporation, and Ella Ostroff, provides that Ostroff will pay the Corporation $250,000 in return for a 3% interest in the Corporation, and specifies how and when she is to be repaid.[2] (Sa001-002).  The

---

[2]The relevant portion of the Investment Agreement provides:

IT IS, on this 27th day of July, 1989, hereby agreed between the parties as follows:

1.  Ella Ostroff shall pay to St. Lucia Hotel Corporation the sum of Two Hundred Fifty Thousand Dollars ($250,000).

2.  In consideration of the payment of the Two Hundred Fifty (sic) Dollars ($250,000) described in Paragraph 1 above, Ella Ostroff shall receive a three percent (3%) interest in St. Lucia Hotel Corporation.  This interest will not be diluted in any way without the prior written consent of Ella Ostroff.

3.  St. Lucia Hotel Corporation shall apply the Two Hundred Fifty Thousand Dollars ($250,000) referred to in Paragraph 1 above as follows:

a. One Hundred Twenty-Five Thousand Dollars ($125,000) shall be applied to the casino project in Rodney Bay, St. Lucia.

7

Estate attacks the authenticity of this document and asserts that neither Brown, Michael, nor Rubin ever saw a signed original, and that Ostroff did not recall signing it. In addition, the Estate hints that Rubinstein "doctored" Ostroff's signature on the Agreement. Rubinstein claims that Ostroff did sign the Investment Agreement and that it is genuine. Although Ostroff apparently intended the funds in the trust account to be held to pay the Corporation's legitimate and ongoing expenses, she never had any contact with Brown & Michael nor did she ever see any bills. Nevertheless, at her deposition Ostroff contended that:

"That $250,000 was -- I think the checks, it was three, and they went to Brown & Michael, a law firm in Atlantic City that I understood represented the hotel corporation. They were to pay bills that I approved, not just pay, but that I knew about and approved of."

Ostroff deposition at A1192-1193. Ostroff claimed that the money was not an investment. "Not the way I understood it. . . It was an escrow. I understood they were holding it in escrow, Brown

---

b. One Hundred Twenty-Five Thousand Dollars ($125,000) shall be applied to the condominium project at Rodney Bay, St. Lucia.

4. St. Lucia Hotel Corporation shall repay to Ella Ostroff the sum of One Hundred Twenty-Five Thousand Dollars ($125,000) upon the full and final funding of bond to be underwritten by Kirchner Moore & Company estimated to occur on or before November 30, 1989.

5. St. Lucia Hotel Corporation shall repay to Ella Ostroff an additional sum of One Hundred Twenty-Five Thousand Dollars ($125,000) at such time that construction financing for the condominium project at Rodney Bay, St. Lucia is fully received.

8

and Michael." Id. at 1193-1194.

It is undisputed that Ostroff was actively involved in the Project from June 1989 through April 1990. She traveled to St. Lucia, Hong Kong and New York in connection with the Project, and she paid the firm of Laventhal & Horwath to study the Project. However, at a meeting in her home, Ostroff told Rubin that she had no intention of proceeding with the financing that Rubin was relying upon.

Finally, in April of 1990, Ostroff wrote a letter to Rubinstein complaining that he had misled her as to the Corporation's ownership of the land on which the Project was to be built. In August or September of 1990, Laventhal & Horwath's feasibility study confirmed that the Corporation did not own that land.

Numerous law suits ensued, the details of which are not relevant to our inquiry.[3] The instant suit was filed against the law firm of Brown and Michael, G. Michael Brown, Guy Michael and Greenberg Margolis[4] as successor to Brown & Michael. The defendants in turn filed a third-party complaint for

---

[3] Ostroff v. Rubinstein, No. 90-1601 (C.C.P. Phila., filed November 8, 1990)(referred to as the Rubenstein Document Suit by the Estate); Ostroff v. Rubinstein, No. 90-1225 (C.C.P. Phila., filed November 8, 1990)(the Rubenstein Fraud Suit); Ostroff v. Ruben (sic), No. 90-7197 (E.D.Pa., filed November 9, 1990)(the Rubin Fraud Suit); Ostroff v. Resolution Trust Corp. as Receiver for Security Savings Bank, 1992 U.S. Dist. Lexis 12639, aff'd, 993 F.2d 225 (3d Cir. 1993).

[4] Sometime in 1990 Brown and Michael dissolved their partnership and joined the law firm of Greenberg, Margolis. However, after the filing of Ostroff's complaint, they left Greenberg, Margolis and re-established Brown & Michael.

indemnification against Rubinstein, Rubin and Conn.  Conn then cross-claimed against Rubinstein and Rubin, and Rubin, in turn, cross-claimed against Ostroff.  Ostroff then dismissed Greenberg, Margolis and amended her complaint to assert a direct claim against Conn.  Prior to the matter going to trial, however, Ms. Ostroff died and Jack Villanueva was appointed administrator *pendente lite* of her estate and was substituted as plaintiff.

That brings us to the instant complaint which alleges that the release of funds from Brown & Michael's trust account without authorization from, or notice to, Ostroff constitutes conversion and a breach of:  the escrow agreement, the fiduciary duty owed to Ostroff, and the lawyers' duty of good faith and loyalty.  The instant suit also alleges that Conn was negligent, and that she breached her professional duty as a notary public by notarizing the limited power of attorney without actually witnessing Ostroff's execution of that document.

The suit proceeded to trial, and at the conclusion of Ostroff's case, the district court granted the defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), and entered an order dismissing the complaint.[5]  The

---

[5] By Orders dated December 20, 1994 and January 10, 1995, the district court dismissed Ostroff's complaint against Brown & Michael, and Conn.  The defendants'/third party plaintiffs' complaint against Conn, Rubin and Rubinstein; and Rubin's counterclaim against Ostroff were dismissed by agreement of the parties.  However, the district court's dismissal of Ostroff's complaint was incorrect because once judgment as a matter of law was entered, that judgment disposed of the entire case.  Thus, it was improper to also dismiss the complaint.  However, since judgment was entered, we will ignore that procedural anomaly and address the substance of the court's action.

10

court's action was based upon its rulings that (1) Brown and Michael had a right to rely on the limited power of attorney and the letter from Rubinstein when they made the disbursements from the trust account; (2) the Estate failed to demonstrate a causal connection between Ostroff's alleged loss and Brown and Michael disbursing the funds; and (3) Ostroff's actions constituted a ratification of the use of her funds for the Project.

This appeal followed.

**II.**

The standard for granting judgment as a matter of law is set forth in Fed. R.Civ. P. 50(a). That Rule provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a). Our review of the district court's grant of judgment as a matter of law is plenary. St. Paul Fire and Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991). We apply the same standard as the trial court. Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992). The question is whether, viewing the evidence in the light most favorable to the losing party, no jury could decide in that person's favor. Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993). The

11

focus of our inquiry is not on whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly base its verdict. Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1083 (3d Cir. 1995). A judgment as a matter of law must be sustained if the record is critically deficient of the minimum quantum of evidence from which the jury might reasonably afford relief. Id. However, "[i]f the evidence is of such character that reasonable [persons], in the impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury." J.I. Hass Co., Inc. v. Gilbane Bldg. Co., 881 F.2d 89, 92 (3d Cir. 1989)(citation omitted).

## III.

It is appellant's *idée fixe* that Ostroff was an elderly woman whose failing health caused her to fall victim to the outrageous fraud allegedly perpetrated by Rubin and Rubinstein. The accuracy of that assertion, however, is immaterial to the resolution of this appeal. The appellant does not allege any fraudulent conduct on the part of Brown, Michael or Conn. Although appellant alleges that Rubinstein forged Ostroff's signature to the limited power of attorney, there is no allegation that either Brown or Michael knew of the alleged forgery or had any reason to suspect that the limited power of attorney was the product of a forgery or was otherwise invalid. The Estate does mention the misspellings of Ostroff's name on the limited power of attorney, and Brown and Michael's correction of

12

that error, but concedes that Brown and Michael disbursed the funds in reliance upon the documents they were presented with.[6]

The Estate contends that Brown and Michael were not justified in relying on the limited power in releasing the funds. The Estate argues that even though there was a limited power of attorney, Brown and Michael had a duty to (1) notify Ostroff that her $250,000 had been received; (2) secure a written agreement governing the disbursement of those funds; (3) provide notice of the requests to release the funds; and (4) provide Ostroff with an accounting. In essence, Ostroff argues that, had Brown and Michael notified her of each requested disbursement, she would have been in a position to review the request and possibly withhold approval. However, because Brown and Michael did not notify her of Rubin's requested disbursements she lost $250,000.

At trial, Ostroff produced the testimony of Edward Wachs who testified as an expert.[7] Wachs is a New Jersey attorney who testified that he has practiced real estate and probate law for over 25 years and has had extensive experience handling attorney trust accounts. He opined that Brown and Michael "breached the duty of care which [they] owed to Ostroff based on the standard

_____

[6] See ¶ 41 of Amended Complaint ("Brown & Michael relied upon the Limited Power of Attorney notarized by Conn, a New Jersey notary, and upon Conn's Certificate of Acknowledgment in releasing the funds."); and Brief of Appellant at 11 ("In reliance on the altered Limited Power of Attorney, which Brown & Michael believed to be valid because of Conn's notarization of Mrs. Ostroff's signature, by check dated June 15, 1989, Brown & Michael paid $25,000 from Mrs. Ostroff's funds upon Rubin's request to Carnicon.").

[7] The defendants do not contest Mr. Wachs' status as an expert witness.

of care of the average New Jersey attorney."[8]  Brief of Appellant at 16.  According to Wachs, the duty of care included a duty to notify Ostroff of the receipt of each of her three checks; to obtain a written agreement with Ostroff governing the release of the funds; and, absent such agreement, to notify Ostroff of each request for a distribution.  He testified that the duty also included a duty to notify Ostroff that they had received the limited power of attorney from Rubinstein, to notify her of the distribution of the funds, and to provide an accounting.  Wachs opined that each duty was independent of the existence of the limited power of attorney.  In short, in Wachs' view, Brown and Michael were not justified in relying on the limited power of attorney in making the disbursements from the trust account.

In rejecting this view the district court properly held that an attorney's duty under New Jersey law is a question of law to be decided by the court.  See Wang v. Allstate Ins. Co., 592 A.2d 527, 534 (N.J. 1991) ("The question of whether a duty  exists is a matter of law properly decided by the court, not the jury, and is largely a matter of fairness or policy.").

The Estate bases the duty it asserts on three New Jersey Supreme Court cases.  It cites In re Carlsen, 111 A.2d 393, 397 (N.J. 1955), for the general proposition that an attorney's

---

[8]Appellant characterizes this case as one of legal malpractice and repeatedly speaks of Brown and Michael's breach of the standard of care of the average New Jersey attorney. However, it has been neither alleged nor established that there was ever an attorney-client relationship between Ostroff and Brown or Michael or their firm.  In fact, appellant concedes that Brown and Michael represented the Corporation and not Ostroff.

14

"professional obligation reaches all persons who have reason to rely on him even though not strictly clients." It cites In re Gavel, 125 A.2d 696, 704 (N.J. 1956) for the proposition that "money of the client or money collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly. . . ." Finally, the Estate relies heavily upon In re Power, 451 A.2d 666 (N.J. 1982) to support its contention that Brown and Michael were not justified in relying upon the limited power of attorney.

However, these cases do not support the proposition urged by the Estate. In In re Power, a New Jersey attorney (Power), represented a builder (Day), who agreed to convey a parcel of land on which he was to build a house for the Handwerkers. Power prepared a binder for Day, pursuant to which the Handwerkers paid a deposit of $1,000 which Power deposited into his trust account. The binder recited that the Handwerkers' $1,000 deposit would be returned in the event a contract was not executed within 15 days.

No contract was ever executed, and the Handwerkers eventually wrote to Power and requested that their deposit be returned. However, before receiving that request, Day had contacted an architect, and Day owed that architect an outstanding balance of $955. Day and the Handwerkers disputed who was responsible for that bill, but despite that dispute, Power disbursed $955 of the Handwerker's deposit to Day who used the money to pay the architect's bill. However, Power subsequently obtained the money from Day and returned it to his trust account. Power attempted to rely upon Day's representation

15

that the Handwerkers had approved the disbursement in defending against a complaint that the Handwerkers filed with the Disciplinary Board.  The local Ethics Committee and the Disciplinary Review Board concluded that Power's unauthorized disbursement in the face of an "express written prohibition" was conduct that adversely reflected upon his fitness to practice law.  Id. at 667.  The Supreme Court of New Jersey agreed saying:

> [R]espondent was not justified in relying solely on his client's representation, particularly in the face of the written demand from complainants, who were unrepresented by counsel, that their deposit be returned.  A simple telephone call or short letter to complainants seeking confirmation of the disbursement arrangement would have fulfilled the ethical obligation and avoided or at least foreshortened an entirely unnecessary acrimonious dispute.

Id.   That is clearly not our case.  Here, Brown & Michael had no written request from Ostroff for the return of her funds.  On the contrary, they had a writing (in the proper form) that purportedly allowed them to make the disbursements at issue.

In In re Carlsen, an attorney entered into a business relationship with his client.  The attorney misled the client, and never made the contributions to the deal that he was obligated to make under agreements between him and the client.  The venture eventually failed, and the client discovered that the attorney had not lived up to his end of the bargain.  The attorney  attempted to justify his conduct by arguing that he was not functioning as the client's attorney, but as his business partner, and therefore, did not owe a heightened duty to disclose.  The court was less than impressed by that argument.

> [The attorney] denies there was ever any

16

> attorney-client relationship between Bush and himself insofar as the Puerto Rican venture was concerned, but we reject this position without hesitation. Bush was a general client and was brought to the venture by his general attorney. True, they . . . both participated as principals but that did not remove the trust and confidence of their relationship. . . . [T]his court [has] expressly recognized that an attorney who wishes to be a business man must act in his business transactions with high standards and that his professional obligation reaches all persons who have reason to rely on him even though 'not strictly clients.'

17 N.J. at 345-6.

In In re Gavel, an attorney who was trying to sell a client's property made false and misleading representations to that client and to banks involved in financing. In the process of attempting to extricate the client from financial difficulties, the attorney conveyed the client's real estate to his own wife and remortgaged the real estate to pay the client's debts while retaining the profits from the refinancing for himself. He also commingled the client's funds with his own and regularly used client trust funds for unauthorized purposes. In finding the attorney had violated the Canons of Professional Ethics the court spoke specifically of his pattern of reprehensible conduct, and noted the duty an attorney owes to clients, and the public in general.

> To the public [a lawyer] is a lawyer whether he acts in a representative capacity or otherwise. . .
> 'The fiduciary obligation of a lawyer applies to persons who, although not strictly clients, he has or should have reason to believe rely on him.

22 N.J. at 265. Here, the limited power of attorney defined the

17

scope of Ostroff's purported reliance. She was relying upon them to make disbursements when requested; and that is what they did.

Although we agree with the Estate's contention that Brown and Michael are required to conduct their practice in accordance with the Code of Professional Responsibility, the record before us does not establish that their conduct breached that Code. Brown and Michael did not receive any funds on Ostroff's behalf from a financial institution or any other person or institution. Instead, they received three checks which Ostroff admittedly signed and caused to be mailed to them. The Estate cites us to no authority that supports its position that an attorney who receives funds properly mailed to him or her has a duty to inform the sender when those funds are received, and we are aware of no such authority. Moreover, although it can not be denied that an attorney owes a duty to the public in general[9], the evidence before the district court was addressed specifically to an attorney's duty to Ostroff, and whether Brown and Michael breached that duty individually, or acting as the law firm. Significantly, Brown and Michael did not convert Ostroff's funds to a personal use. They neither derived any personal gain from her funds nor did they attempt to. They merely disbursed the funds to a project that she had intended receive them. The fact that she later became dissatisfied with the Project she was

[9] In Gavel the court noted: "In addition to the duties and obligations of an attorney to his client, he is responsible to the courts, to the profession of the law, and to the public . . . ."

22 N.J. at 264.

18

investing in hardly translates into a breach of duty on the part of Brown & Michael.

We cannot agree with appellant's rather strained argument that Brown and Michael had a duty to notify Ostroff of the receipt of funds she had mailed to them in the first place. Had Ostroff wanted to be notified when the funds were received she could have, and we suspect would have, so requested or used a method of delivery that would have so informed her.

We believe that any duty that Brown & Michael owed to Ostroff springs not from any duty of an attorney, but from the law of agency governing powers of attorney. "A power of attorney is an instrument in writing by which one person, as principal, appoints another as his agent and confers upon him the authority to perform certain specified acts or kinds of acts on behalf of the principal." Kisselbach v. County of Camden, 638 A.2d. 1383, 1386 (N.J. Super. Ct. App. Div. 1994). The primary purpose of a power of attorney is not to define the authority conferred on the agent by the principal, but to provide third persons with evidence of agency authority. Id. "It should be construed in accordance with the rules for interpreting written instruments generally." Id.

Here, Rubinstein presented Brown and Michael with a limited power of attorney, which contained a notarial seal. Ostroff thereby purported to appoint Rubinstein her agent, and appeared to give him the authority to authorize Brown and Michael to release the funds she had deposited with them. "Authority may be created by words or conduct that agent reasonably believes

19

indicate principal's desires, but no more is authorized." Id. (citing Restatement 2d of Agency §§ 26 and 33 (1958)). Rubinstein's alleged forgery of the document does not support an inference that Brown & Michael were parties to any impropriety. They were entitled to conclude that they had been given the authority to make disbursements on behalf of Ostroff. Furthermore, Rubinstein provided Brown and Michael with a letter authorizing them to release funds for the use of the Project upon Rubin's request. Brown and Michael properly relied upon the limited power, and Rubinstein's letter, to make disbursements from their trust account. We find nothing in the circumstances before us that would require Brown and Michael to notify Ostroff each time Rubin made a request for a distribution.

Rather, we find the reasoning of the court in Heine v. Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt, 856 F. Supp. 190 (S.D. N.Y. 1994), aff'd, 50 F.3d 2 (2d Cir. 1995), persuasive. There, Heine retained an attorney named Ashley to help sell a condominium that Heine owned. Ashley did procure a buyer and so informed Heine. Heine then executed a power of attorney giving Ashley "the power to 'take all steps' necessary to execute the sale of the condominium." Id. at 192. Pursuant to the power, Ashley retained the law firm of Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt ("Newman, Tannenbaum") to represent Heine and to handle the closing. Ashley served as Heine's attorney-in-fact at the closing, and Newman, Tannenbaum served as Heine's counsel. The proceeds of the sale were disbursed in five checks, four of which were payable to Ashley,

and one of which was payable to Heine.  Ashley misappropriated

Heine's check and Heine sued Newman, Tannenbaum asserting that

despite the existence of the power of attorney, the firm breached

the duty of care it owed to Heine.  Heine argued that the breach

occurred by the firm "complying with Ashley's instructions and by

permitting the checks to be drawn payable to and delivered to

Ashley without first communicating with Heine. . . ."  Id.  The
court rejected that argument stating:

> If parties were required to verify with the
> principal each instruction given to them by
> an attorney-in-fact, the authority given to
> attorneys-in-fact would be eviscerated.  No
> party to a transaction would rely on the
> statements of attorneys-in-fact without
> independent verification from the principal,
> and, accordingly, an attorney-in-fact would
> not be authorized to take any and all acts as
> fully as the principal.  If a principal were
> permitted, at a future point in time, to
> decide that a particular instruction should
> have been verified, parties to a contract
> could not and would not be able to rely on
> the statements or instructions of attorneys-
> in-fact.

Id. at 195 (citations omitted).

We agree.  We realize that here, unlike in Heine, the

validity of the power of attorney is in question.  However,

since Brown & Michael did not know that Ostroff's signature was a

forgery that distinction is of no consequence.  If Ostroff was a

victim of a fraud, she was a victim of Rubinstein and/or Rubin's

fraud, and not one perpetrated by Brown & Michael.  Accordingly,

the district court did not err in awarding judgment to Brown &

Michael as a matter of law.[10]

---

[10] The amended complaint also contains a count alleging that
Brown and Michael converted Ostroff's funds.  The district court

21

The Estate seeks to distinguish <u>Heine</u> by pointing out that it concerned a general power of attorney, not a limited power of attorney as we have here. <u>See</u> Estate's Brief, at 35-6. That is a distinction without a difference. It goes only to the scope of the authority conferred upon the principal. It does not alter or diminish the right of a third party to rely upon it when dealing with a principal who appears to be acting within the scope of his or her authority. <u>Kisselbach</u>, <u>supra</u>.

**IV.**

As noted above, Ostroff has asserted a direct claim against Conn alleging that Conn was both negligent and guilty of a breach of a professional duty in notarizing the limited power of attorney without actually witnessing Ostroff's signature. The court did not specifically address the claims against Conn. Rather, the court ruled that the defendants did not breach any duty, and if they did, Ostroff's conduct amounted to a ratification of the defendants' actions thereby absolving them of any liability. However, Conn's conduct here is quite different from that of Brown & Michael. We must first decide if she breached any duty and, if she did, we must decide if the record establishes a ratification by Ostroff.

Conn notarized the limited power of attorney without witnessing Ostroff's execution of it and Ostroff's purported ratification of the disbursements by Brown and Michael is

did not discuss this particular allegation. However, it is clear that appellant produced no evidence that either Brown or Michael used any funds Ostroff deposited in the trust account for their own purposes.

22

irrelevant to any determination of whether Conn breached her duty as a notary in doing so.  A notary is a public officer and owes a duty to the public to discharge his or her functions with diligence.  Immerman v. Ostertag, 199 A.2d 869, 872-873 (N.J. Super. Ct. Law Div. 1964).  However, under New Jersey law, a notary is not an insurer and is not liable except for negligence.  Commercial Union Ins. Co. v. Burt Thomas-Aitken Construction Co., 253 A.2d 469, 471 (N.J. 1969).  A notary has a duty to refrain from acts or omissions which constitute negligence.  That is "a duty which he owes not only to persons with whom he has privity but also to any member of the public who, in reasonable contemplation, might rely on the officer's certification."  Immerman v. Ostertag, 199 A.2d at 872.  "With respect to the identities of signers, the law requires nothing more of the notary than the use of a reasonable care to satisfy himself or, in other words, to become satisfied in his own conscience that the signers are the persons they purport to be."  Id. at 873.

It is apparent that Conn affixed her notarial seal to the limited power of attorney only as a favor to Rubinstein without taking any steps reasonably calculated to insure the genuineness of the signature.  This was clearly negligent and breached the duty that Conn owed to the public as a notary.

However, it is not enough that a notary's negligence be shown in order for a plaintiff to recover against a notary.  A causal relationship between the notary's negligence and Ostroff's loss must be shown.  Id. at 874.  From the record developed thus far, it appears that Brown & Michael relied upon the authority

23

they thought the notarized power of attorney evidenced.[11]

Accordingly, we must determine if the district court correctly concluded that Ostroff ratified the disbursements from the trust account.  If Ostroff did ratify the disbursements, Conn's negligence was of no consequence.

In Thermo Contracting Corp. v. Bank of New Jersey, 354 A.2d 291, the New Jersey Supreme Court wrote:

Ratification is defined in Section 82 of the Restatement of Agency 2d (1957):

Ratification is the affirmance by a person of a prior act which did not bind him but which was done, or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally done by him.

Ratification requires intent to ratify plus full knowledge of all the material facts. Ratification may be express or implied, and intent may be inferred from the failure to repudiate an unauthorized act, from inaction, or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act.

A ratification, once effected, cannot later be revoked, even where the ratification may have been induced by the anticipation of benefits which fail to accrue.

*********************

A principal must either ratify the entire transaction

---

[11] We cannot determine from the record whether Conn was employed by Brown & Michael.  Nonetheless, we note that a private employer of a notary public is not vicariously liable for the notary's negligence or breach of duty unless the private employer participated in the breach or negligence or unless the private employer led another to believe that the notary was acting for it and on its behalf.  Commercial Union Ins. Co. of New York v. Burt Thomas-Aitken Const. Co., 230 A.2d 498, 501 (N.J. 1967).  Here, there is no allegation in the amended complaint that either basis of vicarious liability is present.

24

> or repudiate it entirely, and cannot pick and
> chose only what is advantageous to him.

(emphasis added). 354 A.2d at 361-362. In holding as a matter of law that Ostroff ratified the disbursements, the district court made the following findings.[12] First, the power of attorney and the letter from Rubinstein to Brown & Michael indicated a "continuing authorization to deal with the funds." (A1010). Second, the Investment Agreement itself contains no conditions and no restraints on the release of the funds. (A1011-12). Third, Ostroff brought three lawsuits against Rubin and Rubinstein and in each lawsuit she used the Investment Agreement as evidence that she invested her $250,000 in the Project.[13] (A1012). Fourth, a note written by the plaintiff which indicates that she is to be repaid $125,000. The court found the use of the word "re-pay" to be "consistent with the Investment Agreement." (A1013). Fifth, Ostroff was an active player in the Project. She attempted to arrange financing, traveled to St. Lucia, New York and Hong Kong, and paid to have a study done by Laventhal and Howarth. (A1013-14). On the basis of all these occurrences, the court concluded:

---

[12] The district court did not issue a written opinion. The court's ruling on the defendants' Rule 50(a) motion was given from the bench. Thus, the citations and references from the district court's opinion are references to the appellant's appendix which contains the transcript of the court's ruling.

[13] The district court was mistaken in its finding that Ostroff used the Investment Agreement as evidence that she invested $250,000 in the Project in the three different lawsuits she filed against Rubinstein and Rubin. The Investment Agreement and Ostroff's investment in the Project are referred in only two of the suits, i.e. in the Rubinstein Fraud Suit at ¶¶ 6 and 25 and in the Rubin Fraud Suit at ¶¶ 5 and 6. There is no reference to the Investment Agreement in the Rubinstein Document Suit.

Therefore, without evidence in the record, this court can't have this jury speculate that the monies that were spent would not have been authorized by her because in fact it came at a time when, if anything, she was working to insure the success of the project. It if (sic) failed in that early stage because of lack of financing, why is it not reasonable to conclude that it was because of her inability to line up financing. But it's not for us to speculate whether or why there was the failure of the project, but just to view what her activities were at that time. Now it could very well be that she was deceived by Rubin and Rubinstein. But a party who deals through agents can't then turn around and have the failures of that agent visited upon someone else without that someone else having some information, some notice which appears to be the very thing that the plaintiff was attempting to do here with respect to Brown and Michael.

And I do feel that under all the circumstances and certainly there is more in the record that all her activities and actions indicate that she was an active participant, fully aware of what the up-to-date financing of the project was. She was the prime mover up to that point. She expended money from the Corporation. She cannot now without any record facts turn around and say I've suffered a loss of two hundred fifty thousand dollars, a loss that was never alleged in prior litigation.

(A1015-16).

We disagree with the conclusion of the learned trial judge. We do not believe that this record supports a finding of ratification as a matter of law. First, Ostroff claims that she had no recollection of signing the Investment Agreement and the original Agreement apparently no longer exists. The authenticity of that document is therefore, clearly in dispute. Second, even if Ostroff did sign the Investment Agreement, she did so on July 27, 1989, which was well over a year before the time when Ostroff

26

claims she first became aware of the disbursements from the Brown & Michael trust account.  Her act of signing the Investment Agreement clearly does not ratify an event which had not yet occurred.  She can not ratify an action that she is not aware of.  Thermo Contracting Corp., 354 A.2d at 361.  All of Ostroff's activities on behalf of the Project took place before October of 1990, when it is alleged that she first learned of the disbursements.  Once Ostroff learned of the disbursements in October of 1990, she immediately started suit against Rubinstein and Rubin to recover the $250,000.  The institution of two lawsuits to recover the funds is certainly not consistent with ratification of the disbursements.  Third, as the Estate argues, even if the Investment Agreement is genuine, its terms do not expressly contradict the contention that no funds would be disbursed from the trust account without Ostroff's approval.

We believe that the evidence here is of such a character that "reasonable [persons], in the impartial exercise of their judgment may reach different conclusions" on the resolution of the ratification issue.  J.I. Hass Co., Inc. v. Gilbane Bldg. Co., 881 F.2d at 92.  Thus, we find that the district court's grant of judgment as a matter of law on the ratification issue improperly deprived the appellant of a jury fact-determination as to Conn's liability.  Accordingly, we must remand to the district court for a factual determination of the ratification issue as to Conn.

In addition, because the district court inappropriately granted judgment as a matter of law as to Conn, there remains the

27

further issue of whether Conn's negligence was the proximate cause of any loss or damage to Ostroff should it ultimately be determined that Ostroff's actions did not constitute ratification. Although it could be argued that any damages the Estate can prove are equal to the amount of Ostroff's deposits into the trust account, we do not think that the matter can be so easily resolved. On this record, it appears that all of Ostroff's funds did go to the Project that she intended to finance. While she did not receive the return that she no doubt anticipated when she sent the checks to Brown & Michael, that may be because the Project was not a profitable one, not because her funds were diverted to an unintended use. Therefore, it is possible that, notwithstanding Conn's breach and notwithstanding a lack of ratification, the Estate will not be able to prove that it was damaged to the extent claimed. However, we take no position as to the Estate's ability to establish whether Ostroff suffered any damages or the amount of any such damages. Rather, upon remand the district court will have to determine the amount of damages, if any, to which the Estate is entitled if it is determined that Ostroff did not ratify the disbursements, and that Conn's breach caused such damages.

**V.**

Finally, the Estate contends that the district court improperly precluded it from introducing evidence of Rubinstein's conviction for wire fraud and Ostroff's alleged poor health. The Estate wanted to introduce evidence of Rubinstein's wire fraud conviction to show "a signature pattern of fraud, i.e., *modus*

28

*operandi*."  Appellant's Brief at 40.  It wanted to introduce testimony about Ostroff's alleged poor health in order "to provid[e] a rationale for the belief of Rubinstein and Rubin that they could succeed with the fraud, which is self-evident: they thought (correctly) that she was going to die and thus there would be no witness against their version of the transaction." Appellant's Brief at 41-42.

The Estate forgets that this case is against Brown & Michael and Conn.  There are no allegations that they participated in any fraud against Ostroff or that they believed Rubinstein or Rubin were victimizing her.  Thus, any evidence of Rubinstein's prior conviction or of Ostroff's health is totally irrelevant to the claim against these defendants.

## VI.

For the above reasons, we will affirm the grant of judgment as a matter of law to the law firm of Brown and Michael, G. Michael Brown and Guy Michael, reverse the grant of judgment as a matter of law to Helen Conn, and remand for further proceedings consistent with this opinion.